(Nos. 37318-37452 Cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RONALD HANSEN *et al.*, Plaintiffs in Error.

*Opinion filed May 27, 1963.—Rehearing denied September 26, 1963.*

MORRIS GORDON MEYERS, of Chicago, for plaintiff in error Ronald Hansen; and JULIUS LUCIUS ECHELES and MELVIN B. LEWIS, both of Chicago, for plaintiff in error Victor Spilotro.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and EDWARD J. HLADIS and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

A multiple-count indictment returned to the criminal court of Cook County charged Ronald Hansen, Victor Spilotro and Langdon Gates with crimes of receiving stolen property and conspiracy to receive stolen property. After a joint bench trial, a jury having been waived, each man was found guilty under a count which charged that they had received ten stolen hair dryers, valued at $8.95 apiece, and on three separate counts of conspiracy. For each of the charges under which they were found guilty, each accused was sentenced to the penitentiary for identical terms of one to five years, all sentences to run concurrently. Hansen and Spilotro have prosecuted separate writs of error to review the judgments convicting them, and we have consolidated the cases for purpose of opinion.

Ronald Hansen was a Chicago police officer of five years standing, and during the months of July and August, 1961, was assigned as a detective to Area 5 of the burglary division, the headquarters of which was in a detective bureau located at California and Shakespeare avenues. His immediate superior was Sergeant Frank Koutnik. Victor Spilotro, who admitted to a casual acquaintance with Hansen dating back to school days, was the owner of a restaurant, while Langdon Gates operated an antique shop from his home. The charges against them resulted from dis-

closures made to authorities by Ronald Narbut, a professional burglar, after Narbut and Louis Ettelt had been arrested on September 12, 1961, while committing a burglary which has no bearing on this proceeding. At the trial Narbut was the principal witness against the defendants and, generally speaking, if he is to be believed, Hansen and Spilotro had several dealings with him and knowingly received, and conspired to receive, property that was stolen. If Hansen is to be believed, Narbut was acting as an informer for him and all of their transactions had reference to that relationship and were for legitimate police purposes. Spilotro, on the other hand, denied that he had ever seen or spoken to Narbut in his life prior to a court appearance emanating from Narbut's accusations.

The accounts of Hansen and Narbut as to the scope and nature of their relationship are in sharp conflict and, due to the nature of the principal contention made here, a rather extensive and comprehensive statement of the evidence is necessary.

According to Narbut, he first met Hansen and Spilotro on August 2, 1961, and in relating the background for that meeting stated that he and Ettelt had burglarized a store on July 29, 1961, and had stolen seven accordions. After first attempting to sell the merchandise to Gates, Narbut contacted a police sergeant whom he thought was named Fredericks and was allegedly taken by the latter to Area 5. After some conversation there, Narbut said he was given a note by Sergeant Koutnik, as the result of which he drove his car to a Cities Service gasoline station on Grand Avenue near Austin at 7:00 o'clock that evening. We digress to say that no person named Fredericks testified at the trial, but Koutnik appeared as a witness for the defense, at which time he denied giving Narbut a note, or that he had even met or heard of Narbut on August 2. The owner of the accordion shop appeared as a prosecution witness and testified that his store had been burglarized on the

night of June 29, 1961, at which time seven accordions with a value of $6000 were taken.

Returning to Narbut, he said that after he had waited in the vicinity of the gas station for a time, Hansen and Spilotro arrived in a car, and that it was the first time he had seen either man. He testified that he showed the note to Hansen, who read it and then advised the witness he "was at the right place." Following this, Spilotro purportedly opened the service door of the station and told Narbut to pull his car inside. After some dickering, Spilotro purchased the accordions for $500 and Hansen assisted in transferring the merchandise from Narbut's car to another car. Both Hansen and Spilotro unequivocally denied that such a meeting and transaction had ever taken place, while the owner of the gas station, Frank Miavo, testified that the station was closed at the time testified to by Narbut; that Spilotro was not connected with the station and had no key; and that it would have been impossible for Narbut to have driven his car into the station because of two trucks that were stored there every night. Hansen, like Koutnik, said he hadn't even met or heard of Narbut on August 2, 1961.

The next event of consequence occurred on August 17, 1961, when Narbut and Ettelt were arrested on suspicion of burglary and held in custody at Area 5. What then transpired between Hansen and Narbut is in some conflict. Hansen's version was that he first saw Narbut in a showup of prisoners held on that day, and that after first ascertaining there was no conclusive evidence against Narbut, he took the latter aside, explained that his arrest had been only a general pickup, promised to help him, and enlisted his services as an informer. He said that Narbut agreed. The latter, however, denied that he was placed in a showup, but related that Hansen had come to his cell, remarking that he had come to get Narbut and Ettelt out as soon as he had

seen their names on the arrest report. Narbut did agree, however, that he conversed with Hansen for about ten minutes before leaving the station, at which time Hansen represented that "the Captain was on his back," and that he "needed a pinch," whereupon Narbut said he would see if he "could get him something." In this regard, the proof shows that Narbut did in fact make a report of an impending safe robbery to Hansen, and that Hansen, Koutnik and other officers acted upon such information by keeping the site under surveillance all night, but that the crime was never committed. At the trial, Narbut admitted he had fabricated the whole story.

A few days after August 17, Narbut purportedly had another conversation with Gates and told the latter how he had disposed of the accordions, whereupon Gates said he had some diamonds for sale and proposed that Narbut should contact Hansen to see if he was interested. Narbut said he met first with Hansen, and later with both Hansen and Spilotro, but they declined to buy the diamonds because the price was too high. The two defendants categorically denied that such an incident had ever occurred.

Still another bizarre incident told by Narbut purportedly occurred on August 23, 1961, when he met Hansen at Area 5 and told the officer he was going to rob a certain real-estate office that night. Narbut said Hansen told him to be careful, and that he had in fact committed the burglary unmolested but had obtained nothing of value. Hansen also denied this incident.

It was agreed that the two men met again on August 24, at which time Narbut asked Hansen for a loan. There is, however, conflict as to the details. According to Narbut he told Hansen he needed a loan of $300 and after some discussion, it was agreed that Hansen would obtain such a loan and that Narbut would pay him a $50 fee. Before anything further was done about the loan, Narbut and

Ettelt, on August 28, broke into a store and stole three television sets. Narbut said he tried to sell all three sets, first to Gates and then to Hansen, but that neither was interested, and that Hansen finally agreed to accept one of the sets in lieu of the $50 fee he was going to be paid for the loan. Narbut and Ettelt delivered the set to Hansen's home the following day and, shortly thereafter, Narbut met Hansen in a restaurant and was given a $200 loan.

Hansen confirmed that he had made the loan and stated he had done so because he was afraid he might lose Narbut's services as an informer. However, he stated he had only accepted the television set as collateral at Narbut's insistence, and denied that he had any knowledge the set was stolen. In the latter regard, evidence for the defense established that the burglary in which the sets were taken occurred outside Area 5, while prosecution evidence brought out that Hansen had access to stolen property reports.

The most critical transaction involving the parties took place on September 8, 1961, and the days immediately following. Narbut testified that he had another conversation with Gates at which time the latter mentioned that some of his friends had hijacked a truck and had some irons and hair dryers for sale, and suggested that Narbut contact "the cop and his friend" to see if they were interested. Thereafter, Narbut said he talked with Hansen and Spilotro about the proposition and that a meeting was arranged at the gas station. Upon the occasion of the meeting Spilotro allegedly said "they had been unable to get in touch with their people," but that he and Hansen would each take five irons and five dryers. Narbut said he was then given $110 for the appliances, that he was instructed by Hansen to deliver them to Hansen's home, that he gave $90 to Gates, who informed him the irons were in storage and not immediately available, and that he got ten hair dryers from Gates which he delivered to Hansen's home. The dryers were boxed and packed in a carton

upon the top of which was imprinted: "Jewel Tea Company, Jewel Park, Barrington, Illinois, on 8/23/61," and the number "11825."

Evidence adduced by the prosecution established that a truck load of hair dryers, with a bill of lading numbered 11825, had been consigned by a shipper in New Jersey to the Jewel Tea Company in Barrington, Illinois, on August 23, 1961, and that the trailer of the truck carrying the cargo had been stolen from a loading dock in Chicago where it had been parked overnight. Gates, it appears, gave a pretrial statement that he had purchased the dryers from a store, but the store owner, appearing as a witness for the People, denied such a sale. Another store owner testified to an attempt by Gates to sell him 300 irons and 300 hair dryers.

Returning to Narbut's testimony, he stated that he and Ettelt had another conversation with Hansen on September 11, 1961, concerning the purchase of additional dryers, and another meeting was arranged at a restaurant. Hansen came to the restaurant with an officer named "Jack," and told the two burglars to go to the gas station and meet Spilotro. They did so, but Spilotro did not show up and there were no further negotiations. In connection with this aspect of Narbut's testimony, officer John Doran, who appeared as a defense witness, testified that he had seen Narbut and Hansen together in the restaurant one afternoon in September, that he had not heard their conversation or asked questions about the incident, and that he assumed at the time Narbut was one of Hansen's informers. On cross-examination, Doran said that later on, at Hansen's request, he had driven their police car to the vicinity of Grand and Austin, and that Hansen had asked him to slow down as they passed a Cities Service gasoline station near the intersection.

Hansen admitted that he purchased some hair dryers through Narbut, but explained that it had been for the

purpose of discovering and apprehending the thieves. He said Narbut had come to Area 5 claiming knowledge of the theft of 1600 irons and 1600 hair dryers, but refused a request for disclosure of the guilty parties. Hansen said he then asked Narbut to bring him one of the dryers, but that the latter said any dryers would have to be purchased, that the party would not sell less than five, and that he, Narbut, would need $55 to make such a purchase. The officer said he gave Narbut such an amount, and that the five dryers were later delivered to him. When he checked police records and could find no report of stolen dryers, Hansen said he became suspicious and accused Narbut of buying the dryers himself, but that Narbut denied the accusation and promised to arrange a meeting for the following night, (September 12,) between Hansen and the person who had the dryers. Hansen said he had hoped to "crack the case" at such meeting.

On the night of September 12, however, Narbut and Ettelt were arrested while committing a burglary, and the former, admittedly seeking to "make a deal" for himself, made a complete disclosure of his transactions with Hansen and Spilotro to a police captain and an assistant State's Attorney. Acting swiftly, a search warrant was obtained the same night, and, upon going to Hansen's home, officers found the television set and five of the hair dryers described by Narbut. Four of the hair dryers were in a carton in a bedroom, the carton being imprinted with the name of the Jewel Tea Company as previously described, while a fifth was in a kitchen cabinet. Subsequently, the burglary victim identified the television set as one of three taken from his store, while Narbut identified the dryers as part of those he had delivered to Hansen's home.

Hansen was on duty when his house was searched and was unaware of what was occurring. After the search he was arrested and, when questioned about Narbut's accusations, he told an assistant State's Attorney that he used

Narbut as an informer, and that he had purchased the dryers from him in the hope that he could eventually obtain some information about the theft. He admitted he had paid $55 for the dryers, and said he had not reported the matter to his superior. At this stage a court reporter was brought in, but Hansen said he would not give a statement to the reporter without his counsel. In response to further questioning, Hansen denied that he had ever been at the Cities Service gas station, or that he had ever received a television set from Narbut. When asked if he had a television set in his home, Hansen admitted that he did but first refused to say where he got it because he "didn't want to implicate anyone,". However, when he learned that the set had been recovered from his home and checked out as the one described by Narbut, he admitted receiving it from the latter, then would talk no further, stating it would be better if he didn't answer any more questions. At the trial, Hansen did not deny this testimony of the assistant State's Attorney.

The time and manner of Spilotro's arrest do not appear. However, as a side issue, Narbut testified that on November 10, 1961, while he was outside the criminal court building in advance of a court appearance, Spilotro came up to him, uttered threats, and warned him not to make an identification in court. Spilotro admitted the chance meeting, but denied making threats. By his version, Narbut was pointed out to him and when he inquired of the latter "Are you the fellow who says you know me?", Narbut refused to talk.

Nineteen fellow officers of varying ranks and years of experience testified to their association with Hansen and as to his prior good reputation for honesty, integrity, veracity and performance of duty, and also told of the commonplace use of informers in their police work. One officer testified generally that he knew Hansen worked with informers, while Koutnik, Hansen's immediate superior, stated specifically that he knew Narbut was Hansen's in-

former, and that the latter, around September 8 or 9, 1961, had stated he was working on something with a "stool pigeon" and thought he "could come up with a big score." Hansen denied having received stolen property, or having conspired with Gates and Spilotro to do so, while Spilotro, as we have said, denied knowing either Gates or Narbut and testified that he knew Hansen only casually.

The separate briefs filed by defendants meet on common ground with a contention that their guilt was not proved beyond a reasonable doubt, inasmuch as their convictions rest solely upon the substantially uncorroborated testimony of a self-confessed thief and accomplice. In such regard, this jurisdiction has always followed the common-law rule that the uncorroborated testimony of an accomplice, if it satisfies the court or jury beyond a reasonable doubt, is sufficient to sustain a conviction of a felony. (*People* v. *Baker,* 16 Ill.2d 364; *Gray* v. *People,* 26 Ill. 344.) We have, however, recognized that such testimony is not of the most satisfactory character and that it is attended with serious infirmities, (such as malice toward the accused, promises or hopes of leniency, or the hope of benefits from the prosecution,) which require the utmost caution in relying upon such testimony alone. (*People* v. *Hermens,* 5 Ill.2d 277; *People* v. *Nitti,* 8 Ill.2d 136.) Most particularly is this true where the witness is a self-confessed and discredited criminal, and the proof shows the accused to have been a respectable, law-abiding citizen. (*People* v. *Friedman,* 383 Ill. 193; *People* v. *Cohen,* 376 Ill. 382. Such infirmities, in turn, go to the questions of the weight of the evidence and the credibility of the witnesses, matters peculiarly within the province of the court or jury in the first instance, and if the jury or trial court is satisfied by the testimony of an accomplice that the defendant is guilty beyond a reasonable doubt, we will not disturb a conviction on review unless it is plainly apparent that such degree of

proof is lacking. *People* v. *Todaro,* 14 Ill.2d 594; *People* v. *Rudnicki,* 394 Ill. 351.

In the case at bar, defense counsel elicited from Narbut on cross-examination admissions that he was a professional burglar; that he had lied to Hansen when he informed about the impending safe burglary; that he had lied to the police on another occasion when he represented he had committed a burglary alone; that he would lie to help himself; and that in exposing Hansen and Spilotro when he did he had been motivated by a purpose of "making a deal for himself." When asked directly if he had "a conscience," Narbut replied in the negative, and when asked at the outset of his cross-examination if he "could tell the truth," he first shrugged his shoulders and then answered: "Yes." Looking to these phases of Narbut's testimony, and to the content thereof, both defendants urge that the witness is such a morally deficient person that his testimony should not be believed under any circumstances, and that to permit their conviction to stand on the testimony of such a man would be a gross miscarriage of justice. Stated otherwise, it is their contention that Narbut's admissions and attitude show he had no regard for the oath under which he testified, and that because of this a reasonable doubt of defendant's guilt must be held to exist.

For Hansen it is urged in addition that when Narbut's admissions and background are laid beside the proof which shows: (1) Hansen's prior good reputation for honesty and integrity, and (2) his satisfactory explanation of his possession of the stolen dryers, an even greater doubt of guilt exists. We note in passing that no stolen property was found in Spilotro's possession, and that it was brought out at the trial that he had been placed on probation under a burglary charge eight years previous.

While it may be agreed that Narbut's considerations for himself were paramount, and that for a professional

criminal to name an officer of the law as his accomplice presents an unusual situation, there is in reality little difference here from any other case in which an accomplice is the sole witness against an accused. The trial court, in making its choice between the witnesses, was aware of their respective backgrounds, and was also fully aware of Narbut's callous admissions and self-serving purpose, and thus was cognizant of the infirmities attaching to his testimony. Further, in looking to the weight and credibility of the opposing testimony and witnesses, the trial court could properly consider that Narbut's testimony was not entirely without corroboration, (see: *People* v. *Baker*, 16 Ill.2d 364; *People* v. *Wysocki*, 20 Ill.2d 62,) and that the testimony of Hansen was not without its own infirmities and improbabilities. See: *People* v. *Oswald*, 26 Ill.2d 567; *People v. Spagnolia*, 21 Ill.2d 455.

Narbut told the police he had delivered a stolen television set to Hansen's home and such a set was found there when the officers executed a search warrant. And while Hansen sought at the trial to testify to a logical basis for having the set in his possession, it is not to be overlooked that when he was arrested he denied receiving it from Narbut until confronted with the information that the police had already checked Narbut's story and found it to be accurate. Narbut also said he had sold ten dryers and irons to Hansen and Spilotro for a sum of $110. Five of the dryers were found in Hansen's house and he conceded he had paid Narbut $55 for them. It is true Hansen sought to explain his possession and the expenditure of the money on the ground that he was using Narbut as an informer, but this explanation has a hollow ring when other portions of the record are considered. Hansen said he had not noticed the "Jewel Tea" markings on the carton in which dryers were found in his home, and that a check he made of the records did not disclose the dryers to be stolen. Yet another officer testified that after the dryers had been recovered

from Hansen's home it took him only 15 to 30 minutes to ascertain their origin and ownership. Also militating somewhat against Hansen's explanation at the trial was his reluctance at the time of his arrest to give a written statement about the dryer transaction without his counsel, and his refusal to answer further questions after he learned his home had been searched. Such conduct, we believe, was not that of an officer who had done nothing wrong and had nothing to hide.

Of particular significance, and worthy of detailed analysis, is the testimony relating to the meeting of Narbut and Hansen at a restaurant on September 11, the day prior to their arrest and exposure. This meeting was admitted by Hansen and was witnessed by officer Doran, who was his partner on that day. Narbut testified that when Hansen could not get in touch with Spilotro, he told Narbut and his companion, Ettelt, to go to the gas station and that he would meet them there. Following this, according to Narbut, as he and Ettelt were driving toward the station they noticed the officers' car coming toward them and pulled over to the curb, at which time Hansen told them Spilotro was not at the station and they should look for him at another restaurant. Doran, who stated that he had heard none of the conversation between Narbut and Hansen at the restaurant, testified that after leaving, he and Hansen drove to the vicinity of Grand and Austin, and that as they neared a Cities Service gas station Hansen told him to slow down and looked in the direction of the station. Following this, according to Doran, they drove to Grand and Austin, where Hansen had a conversation with one of two men Doran could not identify. The parallels in the testimony of the two witnesses are too close to be mere coincidence and, moreover, officer Doran's testimony to some degree contradicts Hansen's statement to the assistant State's Attorney that he knew nothing about the Cities Service station which figured in Narbut's accusations. Overall, we

believe, Doran's testimony corroborates Narbut's testimony that he and Hansen were seeking Spilotro at the time in question.

A further strain is put on Hansen's "informer" explanation when it is considered, first, that he expended $55 of his own funds to purchase the dryers, and, second, that he also loaned Narbut $200 of his own money. This is particularly true in light of the short period of the alleged relationship and the circumstance that Narbut had been of no value as an informer at all when such funds were advanced, but had in fact given only one bit of information that never materialized. Moreover, while the use of informers and official encouragement of the practice were proved by the defense, it was not established that it was customary for officers to pay informers out of their own pockets, or that substantial payments were made. The only showing in such regard was the testimony of one defense witness who said he had "heard" of informers being paid, and of another that he paid informers: "Not big money, [but] gratuities." Hansen's outlays here far exceeded mere gratuities and were completely inconsistent both with his own income and the service he was supposedly being rendered.

Because Hansen was a police officer enjoying the public trust and confidence, and due to the greater possibility that one in his position could be accused out of revenge or malice on the part of a criminal, we have made a critical and searching analysis of the evidence. Due greatly to the improbabilities in his own explanations, we are convinced, as was the trial court, that Narbut spoke the truth and that Hansen's guilt was established beyond a reasonable doubt. Under the circumstances proof of his prior good character and reputation is unavailing. Cf. *People* v. *Todaro,* 14 Ill.2d 594; *People* v. *Arbuckle,* 413 Ill. 441.

The same may be said of the proof of Spilotro's guilt. Apart from the partial corroboration of Narbut found in

Doran's testimony and Hansen's conduct, there was evidence from which the court could find that this defendant had threatened Narbut and warned him not to make an identification, conduct hardly consistent with innocence, and that Spilotro was no stranger to a burglary charge. Further, there is neither showing nor suggestion in the record that Narbut would have had any motive or purpose for singling out Spilotro and accusing him. It is urged on behalf of this defendant that Narbut's testimony was further unworthy of belief because it was contradicted by the testimony of the owner of the gas station to the effect that it would have been impossible to drive a car into the station at night. Once again, however, the credibility of the witnesses and the weight to be afforded their opposing testimony was for the trial court and we see no ground for disturbing his judgment in the matter.

It is further contended on behalf of Spilotro that the prosecution failed to prove that the hair dryers were stolen, (see: *People* v. *MacBeth,* 405 Ill. 608; *People* v. *Rubin,* 361 Ill. 311, 327-328); failed to prove the ownership of the dryers and their value, (see: *People* v. *Krittenbrink,* 269 Ill. 244, 245); and that the trial court imposed an excessive sentence.

While there is a slight discrepancy resulting from an unexplained handwritten date appearing on one of several shipping documents received into evidence, we find there is sufficient and satisfactory proof that the dryers defendants received and conspired to receive were stolen. The traffic manager of the J. B. Williams Company, a New Jersey firm, testified that on August 23, 1961, a shipment of hair dryers in 167 cartons was dispatched to the Jewel Tea Company in Barrington, Illinois, and, from the distinctive markings and number on the carton found in Hansen's home, was able to identify it as part of the shipment. Jewel Tea never received the shipment and was later sent another order of dryers. Documentary evidence

shows that the immediate consignee in the Williams Company bill of lading was the Allied Shippers & Receivers Association in Chicago, Illinois. An employee of the Chicago Express Incorporated, residing and working in New Jersey, testified that he had loaded the 167 cartons in a trailer and had delivered it to his dispatcher, while Eugene DeSanto, a driver for the express company in Chicago, testified that he had picked up the trailer at a railhead in Chicago on August 29, 1961. He had to break the seal and open the trailer to get the bill of lading, and, as he did so, he noticed the contents were cartons of hair dryers. DeSanto drove the trailer to a loading dock of Allied Shippers, but the latter declined to accept it due to the time of day, and DeSanto, who resealed the trailer, was given permission to park it at the Allied dock overnight. It was missing the following day and was later found parked on a street with the seal broken and the contents gone. While it is true that proof beyond reasonable doubt that the goods were stolen is a part of the *corpus delicti* of the crime of receiving stolen goods, it is also true that such element is not necessarily required to be established by direct evidence. Circumstantial evidence, which is legal evidence, may be resorted to for the purpose of proving the *corpus delicti* as well as for the purpose of connecting a person with the crime, and we have consistently held that circumstantial evidence may be sufficient to establish that the goods received were in fact stolen. (*People* v. *Allen,* 407 Ill. 596; *People* v. *Rife,* 382 Ill. 588.) From the entire record, it appears to have been established beyond a reasonable doubt that the dryers were stolen.

Defendants were found guilty on counts which alleged that the dryers had been stolen from the Chicago Express Incorporated, and Spilotro's argument that the People failed to prove "ownership," is in reality a contention that there is a variance between the proof and the allegations

of the indictment. It is his theory that custody of the shipment had passed to Allied at the time of the theft. A special property right, or possession of property, such as that enjoyed by a bailee or a carrier is sufficient to prove ownership as against one who has stolen the property, (*People* v. *Fitzgerald,* 297 Ill. 264; *People* v. *Trefonas,* 9 Ill.2d 92,) and in this case it is clear that such a property right was in Chicago Express at the time of the theft, inasmuch as Allied Shippers had refused to accept the shipment. The mere presence of the trailer and its cargo on or near its premises would not establish possession or a special property right in Allied Shippers, (Cf. *Caringella* v. *United States,* (7th cir.) 78 F. 2d 563,) particularly since the uncontradicted proof shows that the special rights of Chicago Express in the property had not come to an end or been transferred to Allied when the theft occurred.

Within this point of argument it is also suggested by said defendant that two conspiracy counts under which he was found guilty are defective because they allege ownership of stolen goods in "a corporation" which is not named. In addition it is urged there is no proof to support these counts, or that the proof in the record which shows that ownership of the *dryers* was in Chicago Express, is at variance with so much of the counts that fail to state the name of the corporation. (See: *People* v. *Livermore,* 390 Ill. 85, 95.) No motion to quash these counts was made before trial and thus the technical objections now raised thereto must be deemed to have been waived. (*People* v. *Cox,* 20 Ill.2d 458.) And there is proof which dispels defendants' further contentions. The evidence shows that Hansen and Spilotro also conspired to receive stolen irons, the identity of the owner being unknown, and had in fact gone so far as to advance funds for the purpose. The offense of conspiracy was complete at the time defendants agreed to receive stolen property, even though it may not

have been known at the time who was the owner. See: *People* v. *Beeftink,* 21 Ill.2d 282; 15 C.J.S., Conspiracy, sec. 84; and cf. *People* v. *Quesse,* 310 Ill. 467.

Based upon the testimony of a buyer for the Jewel Tea Company, who stated that the fair cash market value of each dryer was $8.95, the trial court found the value of the stolen property received by defendants to be $89.50. Spilotro, in an arduous effort to make it appear that he was guilty only of a misdemeanor, contends that the court's finding of value is not supported by the evidence. It is his theory that since only five dryers were recovered the value should be fixed at $44.75, or, in the alternative, that if the value of all ten testified to by Narbut is to be the criterion, then the unit wholesale cost of $4.98 must be employed inasmuch as the dryers had not yet reached their retail outlet. Neither theory has merit. Although only five dryers were recovered, there is proof in the record that ten were received by defendants. The value of stolen property is not judged by the amount recovered. Indeed, a conviction of receiving stolen property may be sustained even though none of it is recovered. (*People* v. *Johnston,* 382 Ill. 233.) Further, in cases such as this, value is not based upon the cost of the stolen merchandise, but upon its fair cash market value. (*People* v. *Todaro,* 14 Ill.2d 594; *People* v. *Evans,* 23 Ill.2d 302.) At the time the dryers were stolen the only market open for their sale was the retail market.

Spilotro was sentenced on December 18, 1961, or just 13 days before January 1, 1962, the date the new Criminal Code enacted by the 72nd General Assembly was to become effective. (See: Ill. Rev. Stat. 1961, chap. 38, par. 34—4.) Under the new Code, the maximum penalty for each of the offenses of which defendant was convicted was imprisonment for one year, (see: Ill. Rev. Stat. 1961, chap. 38, pars. 16—1 and 8—2c,) as compared with the 5-year maximums imposed under the prior Code. On August 15,

1962, while review was pending, Spilotro made a formal motion in the trial court for a reduction of his sentences to penalties within the limits of the new Code. The motion was denied and the same claim is now pursued in this court. Judgment and sentence here were pronounced prior to the effective date of the new Code, which incorporates by reference section 4 of the Statutory Construction Act, (Ill. Rev. Stat. 1961, chap. 38, 34—3,) which provides that a punishment mitigated by a new law is applicable only to judgments after the new law takes effect. Ill. Rev. Stat. 1961, chap. 131, par. 4.

The judgments of the criminal court of Cook County are affirmed.

*Judgments affirmed.*