THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAROLD L. PIEHL, Defendant-Appellant.

(No. 54930; ■■■■■■

First District—June 16, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Lee T. Hettinger and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Stephen Connolly, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

The defendant Harold Piehl was indicted on six counts of theft (receiving stolen property, Ill. Rev. Stat. 1969, ch. 38, par. 16—1(d)) and one count of conspiracy to commit theft. (Ill. Rev. Stat. 1969, ch. 38, par. 8—2.) Irving Anderson (among others) was named as a co-defendant in one theft count and the conspiracy count. After a joint jury trial defendant Piehl was found guilty on five theft counts and the conspiracy count. Judgment was entered on the substantive counts and Piehl was admitted to five years probation with the last 60 days to be served in the Cook County Jail. The State's Attorney refrained from prosecuting the other theft count. Anderson was found guilty on both the theft and conspiracy counts. This appeal concerns only defendant Piehl.

On appeal defendant contends: (1) that the State failed to prove that the crime he was convicted of was committed in Cook County as alleged in the indictment; (2) that the felony conviction must be reduced to a misdemeanor because the jury was not instructed that the value of the stolen property had to exceed $150 and the verdicts returned were only general in nature; (3) that the prosecutor committed prejudicial error when in the jury's presence he accused the defendant of conspiring with his attorney to fabricate testimony; (4) that he was improperly convicted on two of the substantive counts because the State failed to prove ownership as alleged in the indictment; and (5) that the State failed to prove beyond a reasonable doubt that the defendant received property knowing it had been stolen.

In late 1967 and throughout 1968 defendant worked at Fort Sheridan, a military base; he also did part time accounting work for Irving Anderson, his co-defendant. Anderson operated a refrigeration and air-conditioning business. It was through this relationship with Anderson that the defendant met Vernon Tracy; Tracy had also worked with Anderson. Tracy admitted stealing a number of automobiles during the years of 1967 and 1968 and selling them to Anderson and the defendant. Prior to defendant's trial, Tracy pleaded guilty to the offense of theft and was placed on probation for five years with the first year to be served in the Cook County Jail. Tracy testified that he had not yet served his sentence but expected to do so. He had previously served jail sentences for larceny, auto theft and passing bad checks.

Tracy testified that the first time he conversed with the defendant was on January 12, 1968. Both men were visiting Anderson in a Chicago hospital. Tracy and the defendant went for coffee in the hospital cafeteria at which time, Tracy testified, "We struck up an acquaintance about selling cars." Tracy's version of the conversation was that since he would no longer be able to deal with Anderson due to Anderson's illness, he wondered if the defendant would be interested in dealing with him. The defendant answered that if Tracy could come up with titles to the cars and wait for payment until delivery was made, he could do business with him. The defendant denied making this statement when he testified. The defendant testified that Tracy first asked him whether he was interested in buying any one of three cars that Tracy had for sale; that when the defendant said he couldn't afford one, Tracy asked whether he knew of anyone else that might be interested. The defendant further testified that Tracy told him the cars were purchased at auctions and from a source in Las Vegas; that he had to get rid of the cars or his source would be cut off; that the cars were covered by legal Illinois titles. Tracy denied that he said the cars were repossessions or that they came from Las Vegas. Rather, he told the defendant that he could get automobiles for him at a good price; that each car had a Minnesota certificate of title but that he would provide an Illinois title.

Tracy met the defendant three weeks later at Fort Sheridan. Tracy testified that he told the defendant that he and his partner had agreed to the defendant's terms. Some time in March 1968 Tracy delivered a 1967 Cadillac to the defendant. The defendant told Tracy the name to put on the title; defendant was to pay for the car 21 days later; Tracy testified that the defendant subsequently paid him $1500 for the car. About two weeks later Tracy delivered a 1968 Chevrolet station wagon to the defendant; it was for the defendants own personal use. The defendant signed the appropriate title papers and payment was promised 21 days later. Tracy testified that he received $500 for the car. The defendant testified that he paid $3127 of which $1900 came from a bank loan; that Tracy told him the car had been lost at the gambling tables in Las Vegas.

Around May 1 Tracy again met with the defendant who, according to Tracy's testimony, told Tracy that a friend, Lou Volke, the Chief of Police of Fox Lake, could use a car. Tracy testified that he could get a car at a reasonable price if Volke could get him a police sticker; that several days later he informed the defendant that he had a 1968 Cadillac for Volke; that the defendant obtained the police sticker for Tracy and the 1968 Cadillac was delivered to the defendant. The defendant testified that Tracy first asked him to get a police sticker from the Village, which

the defendant proceeded to obtain from Volke; that thereafter Tracy told him that he could get the police chief a car at a good price in return for the favor; that the defendant went to Volke and told him that Tracy bought cars at auctions and through a Las Vegas connection. Defendant further testified that the price Tracy first mentioned was $4000; that Volke gave an envelope to the defendant containing cash in payment for the Cadillac; that this amount was turned over to Tracy. Volke testified that the envelope contained $2230. Tracy testified that the original sales price was $600 but that the defendant gave him $500.

The defendant testified that he first began to seek purchasers for cars in November 1967 when Irving Anderson told the defendant that he had bought two cars from his partner (Tracy) who in turn had bought them at an auction or from companies which repossessed cars in Las Vegas. Anderson was short of cash and wanted to sell the cars; he asked the defendant for help. One car, a 1965 Cadillac, was sold through an ad in a newspaper to Mr. Sigurt Fugelseth for $2900; the $2900 was turned over to Anderson. The other car, a 1967 Pontiac, was sold to William Mestan for $1900; defendant was a close friend of Mestan; the $1900 was turned over to Anderson. In April 1968 Anderson told the defendant that Tracy had a 1968 Chevrolet two-door to sell. The defendant told a co-worker of his, Lieutenant Joseph Hlavaty, about the car. Hlavaty's father asked the defendant what was wrong with the car since the price was so low. Defendant said nothing was wrong with it; that he didn't care whether Hlavaty bought it or not. Hlavaty gave the defendant $500; this amount was turned over to Tracy. To the defendant's knowledge Hlavaty paid nothing more for the car.

Mrs. Kathleen Wheaton, a defense witness, testified that she was with the defendant and Tracy when they had coffee at the hospital Anderson was in. All three people were seated at a counter; Tracy was seated next to her and the defendant was on the other side of Tracy. She heard Tracy ask the defendant, "Are you interested in getting a car?" The defendant answered, "Not right now." Tracy then asked if the defendant knew anyone else who was interested. The defendant said, "Well, maybe I know, why?" Tracy said, "Well, I have some cars that I bought at auction; I have to get a place for them." On direct examination Mrs. Wheaton stated that further conversation ensued between Tracy and the defendant but that she didn't listen; she drank coffee and talked to the lady next to her. On cross-examination she first stated that she heard all of the conversation between the two men but then reaffirmed her previous testimony that there was a time when they talked among themselves. Mrs. Wheaton is a friend of Irving Anderson, defendant's co-defendant.

On May 27, 1968, defendant was called to the Fox Lake Police Station. There he was informed by Harold Freeman, an Illinois State Policeman, that the vehicle sold to Police Chief Volke had ben stolen. Freeman testified that the defendant was startled and said, "Oh, my God"; that the defendant told Freeman to check out his car (the 1968 Chevrolet station wagon) since he had bought it from the same man, Tracy; that Tracy picked these cars up from various sources; they were executive driven autos and cars lost at the gambling tables in Las Vegas. The defendant testified that until this time he had no inkling that the cars were stolen; that he never saw a Minnesota certificate of title.

Irving Anderson testified in his own behalf. He purchased only three cars from Vernon Tracy, a Buick, a 1965 Cadillac and a 1967 Pontiac. Tracy never told him that the cars were stolen. The Cadillac and Pontiac were sold by the defendant who was Anderson's good friend and accountant; the defendant had told Anderson that he could not afford to purchase the two cars; the defendant received no compensation for making the sales.

The State, in its case in chief, had four persons testify that they purchased cars from the defendant. (The defendant used a fifth car, a 1968 Chevrolet station wagon, for his own use.) Sigurt Fugelseth purchased a 1965 Cadillic for $2900; his initial contact with defendant came through an advertisement defendant's wife placed in an Antioch, Illinois, newspaper to sell her own car. Joseph Hlavaty, who worked with the defendant, told the defendant that he was look for a new car; the defendant told Hlavaty that he had met a fellow at a party who sold cars that were repossessed, executive driven or sold to settle estates; Hlavaty subsequently bought a 1968 two-door Chevrolet; the total purchase price was $2000 but at first only $500 was given to the defendant; Hlavaty was then notified by the police that the car he bought was a stolen one. Louis Volke, the Police Chief of Fox Lake, purchased a 1968 Cadillac from the defendant in mid-April 1968; the price was $2230; the Illinois title he received appeared to be valid; in May he gave the defendant two police courtesy stars; the defendant said they were for a couple of friends; Volke has known the defendant for 17 to 20 years. William Mestan purchased a 1967 Pontiac in January 1968 for $1900; the transaction resulted from a conversation he had with the defendant at Mestan's restaurant in Fox Lake; Mestan said he was in the market for a car; the defendant, an old friend, told Mestan he had a friend at Fort Sheridan who sold repossessed cars and that he might be able to arrange a good deal; the defendant first gave the Pontiac and a Minnesota registration card to Mestan; thereafter Mestan paid defendant for the car and obtained an Illinois title.

Defendant first testified that he handled and sold only five cars. Subsequently he was asked if he knew Lucille O'Donnell. He answered, "Yes." He was then asked if he had sold a car to her. Over objection of defense counsel defendant answered, "No."

Lucille O'Donnell testified for the State on rebuttal. She works at Fort Sheridan. In May 1968 the defendant told her that he had brought her a car, a 1967 Cadillac. She was given the keys to the car. A week later the defendant told her he would have to $1000 right away; she gave the $1000 to him. She then obtained a loan from the Fort Sheridan credit bureau and gave the proceeds to the defendant in further payment; she also gave defendant her used 1962 Cadillac.

The defendant testified in surrebuttal. He did have the occasion to talk with Mrs. O'Donnell about the 1967 Cadillac. The auto came from Vernon Tracy. She gave him a $1000 down payment when the car was delivered; this sum was given to Tracy. The remaining balance due was $1530; Mrs. O'Donnell obtained the $1530 through a loan at the credit bureau of which he is a vice-president. He told Mrs. O'Donnell that the car was "a factory deal from Detroit"; this is what Tracy had told him. Mrs. O'Donnell's 1962 Cadillac was to be returned to Detroit.

The record also shows that the original owners of the 1967 Pontiac (sold to Mestan), the 1968 Chevrolet station wagon (kept by the defendant) and the 1968 two-door Chevrolet (sold to Hlavaty) testified that their cars had been stolen at various locations within Chicago. The Pontiac cost $3800 when bought new; it had been driven only 800 miles when stolen. The Chevrolet station wagon was valued at $4100. The two-door Chevrolet was only two months old when it was stolen. Melvin Jacobs, the owner of the 1965 Cadillac (sold to Fugelseth), testified that it was stolen from a Chicago parking lot while he was at work; it was valued at $4000. It was stipulated that the venue in respect to the indictment was in Cook County, Illinois.

*Opinion*

● 1-3  Defendant first contends that the State failed to prove venue in Cook County beyond a reasonable doubt "since the basis of the conviction was that the defendant knowingly received stolen property and the facts in support of that proposition all occurred in Lake County, Illinois, * * *." It is unquestioned that an averment in an indictment that the crime was committed in a particular county is a material element in the State's case, one which like all other elements must be proven beyond a reasonable doubt.( *People v. Allen,* 413 Ill. 69, 76, 107 N.E.2d 826; *People v. Mowry,* 6 Ill.2d 132, 126 N.E.2d 683.) However, as stated in *People v. Hare,* 25 Ill.2d 321, 324, 185 N.E.2d 178, 179:

"[A]n accused may by stipulation waive the necessity of proof of all

or any part of the case which the People have alleged against him and that having done so, he cannot complain in this court of evidence which he has stipulated into the record. [Cases cited omitted.]"

■■ In the instant case, after nine of the ten State's witnesses had testified, defendant's privately retained attorney stipulated that venue, as alleged in the indictment, was in Cook County, Illinois. Defendant made no effort during the trial to gain relief from the stipulation; nor did he raise the issue in his post-trial motion. Therefore, we believe he must be bound by it.[1] See *In re Estate of Moss*, 109 Ill.App.2d 185, 248 N.E.2d 513.

■■ Defendant next contends that his conviction must be reduced to a misdemeanor because the jury received no instruction that the value of the property taken had to exceed $150 and the verdicts returned were general in nature with no specific finding as to value. The theft statute (Ill. Rev. Stat. 1969, ch. 38, par. 16—1) does provide that if the property stolen exceeds $150 in value the offense is a felony, whereas if its value is $150 or less the offense is a misdemeanor. Defendant does not contend that proof was lacking as to value nor would such an argument have any substance. The uncontradicted evidence showed that the 1967 Pontiac cost $3800 when bought new and that it had been driven only 800 miles when stolen; the 1968 Chevrolet station wagon had a value of $4100 when stolen; and the 1968 Chevrolet two-door was only two months old when stolen. Defendant tendered no instruction as to value and its relation to a lesser included offense. Under these circumstances, where no issue of value was raised and the evidence clearly established the property's value to be in excess of $150, a general verdict was sufficient to sustain a felony conviction. *People v. Tomaszek*, 54 Ill.App.2d 254, 261, 204 N.E.2d 30; *People v. Wilson*, 84 Ill.App.2d 269, 275, 228 N.E.2d 131.

■■ Defendant's next contention is that he was denied a fair trial when the prosecutor, in the presence of the jury, accused the defendant of "conspiring with his attorney to fabricate his testimony." The record reveals that the prosecutor merely asked the defendant on cross-examination whether he had talked with his attorney concerning the testimony

---

[1] We might add that although defendant was only sentenced on the substantive counts, he was also found guilty of conspiracy to commit theft. As to the conspiracy count, it is clear that the State proved that venue was in Cook County as alleged in the indictment; Vernon Tracy, a co-conspirator, committed acts in furtherance of the conspiracy (stealing the cars) within Cook County, thus establishing venue therein. Ill. Rev. Stat. 1969, ch. 38, par. 1—6 (m) provides:

"A person who commits an inchoate offense may be tried in any county in which any act which is an element of the offense, including the agreement in conspiracy, is committed."

of another witness prior to taking the witness stand. No objections were made at the trial by defense counsel during this series of questions; therefore, any error arising therefrom is waived. *People v. Adams,* 41 Ill.2d 98, 101, 242 N.E.2d 167.

■■ Defendant next contends that he was improperly found guilty on two of the five theft counts. We find it unnecessary to enter into a detailed analysis of his arguments since, as stated in *People v. McCormick,* 92 Ill.App.2d 6, 11, 235 N.E.2d 832, 835:

"One good count in an indictment will sustain a general finding of guilty if the evidence is sufficient to prove the crime charged in that count."

Therefore, if any or all of the three remaining substantive counts can sustain a conviction for theft, reversal as to that offense is not required.

We thus arrive at defendant's final contention which is that the State failed to prove beyond a reasonable doubt (as to the three remaining counts) that the defendant received the automobiles knowing that they had been stolen by another or under such circumstances as would reasonably induce him to believe that they were stolen. (See Ill. Rev. Stat. 1969, ch. 38, par. 16—1 (d).) Defendant argues that the State's case was based upon the testimony of an accomplice, Vernon Tracy; that Tracy's testimony as to the conversation which took place at the hospital cafeteria was impeached by the testimony of Mrs. Kathleen Wheaton; that the defendant had a good reputation in his community; and that the defendant's actions showed that he "may have been naive, but not dishonest."

■■■ A brief review of the evidence reveals that Tracy's version of what was said at the hospital was not necessarily impeached by the testimony of Mrs. Wheaton. Although those portions of the conversation she claimed to have heard were favorable to the defendant's case, she stated on direct examination and reaffirmed on cross-examination that there were portions of their conversation which she did not hear. We also point out that there were variances between the testimony of the defendant and the purchasers of several cars. The defendant stated that he never saw a Minnesota certificate of title; William Mestan testified that the defendant gave such a certificate to him a week before he purchased the 1967 Pontiac. Tracy was the source of the cars, yet Joseph Hlavaty testified that the defendant said his source was a fellow he had met at a party; the defendant told William Mestan that his source was a friend from Fort Sheridan. Defendant at first denied selling a car to Lucille O'Donnell; he subsequently changed his testimony. In short, we believe that the following language from *People v. Hansen,* 28 Ill.2d 322, 332, 192 N.E.2d 359, is particularly applicable:

"[T]his jurisdiction has always followed the common-law rule that the uncorroborated testimony of an accomplice, if it satisfies the court or jury beyond a reasonable doubt, is sufficient to sustain a conviction of a felony. [Cited cases omitted.] We have, however, recognized that such testimony is not of the most satisfactory character and that it is attended with serious infirmities, * * * which require the utmost caution in relying upon such testimony alone. [Cited cases omitted.] Most particularly is this true where the witness is a self-confessed and discredited criminal, and the proof shows the accused to have been a respectable, law-abiding citizen. [Cited cases omitted.] Such infirmities, in turn, go to the questions of the weight of the evidence and the credibility of the witnesses, matters peculiarly within the province of the court or jury in the first instance, and if the jury or trial court is satisfied by the testimony of an accomplice that the defendant is guilty beyond a reasonable doubt, we will not disturb a conviction on review unless it is plainly apparent that such degree of proof is lacking. [Cases cited omitted.]"

We note that in the instant case, as was true in *People v. Hansen, supra,* at 334, the accomplice's testimony was not entirely without corroboration and the testimony of the defendant was not without its own infirmities.

■■ We might add that our above discussion applies equally as well to defendant's conviction for conspiracy to commit theft.[2] The jury evidently believed that there was an agreement between the defendant, Vernon Tracy, Irving Anderson and others to sell stolen cars and that acts were done in furtherance thereof. Therefore, even if we had found occasion to reverse the conviction on the substantive counts, we would nevertheless affirm the decision on the basis of the conspiracy conviction.

The judgment of the circuit court is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.

---

[2] The conspiracy statute (Ill. Rev. Stat. 1969, ch. 38, par. 8—2) provides as follows: "(a) Elements of the offense. A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator."