THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL WEST, Defendant-Appellant.

Fourth District   No. 13983

Opinion filed November 30, 1977.

Richard J. Wilson and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (Robert C. Perry and Jane F. Bularzik, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE WEBBER delivered the opinion of the court:

The defendant, who was then 16 years old, was arrested on October 16, 1975. Following a transfer hearing on December 15, 1975, the court entered an order permitting prosecution as an adult under the Juvenile Court Act of Illinois. (Ill. Rev. Stat. 1975, ch. 37, par. 702—7(3).) On January 14, 1975, a grand jury sitting in Sangamon County returned a six-count indictment charging him with the murder of Gail Krech on June 15, 1975. Various pretrial motions were disposed of and after a five-day jury trial, the jury returned a general verdict of guilty on April 9, 1976. A post-trial motion was denied and after a sentencing hearing the trial court sentenced the defendant to imprisonment for a term of 56 to 100 years. This appeal followed.

Defendant raises three issues on appeal: (1) That the State failed to prove him guilty beyond a reasonable doubt; (2) that he was denied a fair trial by reason of the introduction into evidence and viewing by the jury of certain allegedly inflammatory photographs; and (3) that his sentence is excessive.

Defendant's principal contention on the reasonable doubt issue centers on the testimony of an accomplice, Thomas Cauley. Unquestionably, Cauley's testimony represented the heart and soul of the State's cause against defendant. Both sides concur in the general proposition that such testimony is admissible, but should be viewed with great caution. They differ in the application to the case at bar. Defendant contends that Cauley's evidence was so uncorroborated and unreliable as to require reversal. The State, on the other hand, claims that the evidence was corroborated and not made unreliable by any promises of leniency and that any infirmities in it go to its weight which is the particular province of the jury.

A detailed recitation of the evidence would serve no useful purpose here, so we shall begin with a general narration and later focus on individual items concerned with Cauley to the extent necessary for decision.

On June 16, 1975, the owner of a laundromat in Springfield discovered

a purse in a garbage can behind his place of business. The contents revealed that it belonged to one Gail Krech. Inquiry revealed that Krech had not been seen since the prior Saturday afternoon, June 16, being a Monday. Police were summoned to Krech's apartment, located a few blocks from the laundromat, and discovered her body in a bed. A pathologist's autopsy protocol indicated that she had been dead about 30 hours at the time of discovery and that the cause of death was stab wounds to the chest, puncturing the heart.

Shortly after noon on Saturday, June 15, a householder living about six or seven blocks from defendant's home discovered two youths jumping out of a window in his house, after having apparently committed a burglary. He gave chase and apprehended one of them, who turned out to be Thomas Cauley. Police were called and detained Cauley, who asked to be taken to a nearby alley to retrieve his bicycle. Upon arrival at the alley, police discovered defendant West attempting to saw a chain holding the bicycle to another. (It later developed that the bicycles were those of West and Cauley, but Cauley had the key to the chain.)

Both defendant and Cauley were transported to juvenile quarters in Springfield after being detained for their respective offenses. Their property was removed and inventoried and placed in envelopes. Included in the property were a certain necklace and other items of ladies' jewelry. The envelopes were placed in a police evidence locker.

The investigation of the homicide continued over the summer months under the principal direction of Detective William DeMarco. By late autumn the investigation had begun to focus on West and Cauley and according to DeMarco, "at one point, probably sure happenstance," he noticed the names of West and Cauley in the property book at police headquarters. He obtained the items and they were identified by her parents and friends as belonging to Krech.

Sundry interviews were then conducted by DeMarco and others of both defendant and Cauley with the eventual result that defendant was charged with murder as above described and Cauley with voluntary manslaughter.

At trial Cauley testified that he and defendant were together on the morning of Sunday, June 15, and were seeking places to burglarize. They settled on Krech's apartment and climbed a television antenna beside the house and entered through a bathroom window which was next to the antenna and partially open. After entering, Cauley went to the kitchen and defendant to the bedroom where Krech was asleep in her bed. Both were in the process of rifling the premises; Cauley obtained a necklace and defendant a ring. While defendant was searching a bureau in the bedroom, Krech awakened and began to struggle with him. He called to Cauley for assistance and Cauley entered the bedroom and pressed Krech

to the bed with a pillow over her head and chest, while defendant stabbed her numerous times in the chest with a knife which he was carrying.

They then left the apartment in the same manner they had entered and rode their bicycles to a YMCA where they had a soda. After an interval during which defendant changed his shirt, they then sought other places to burglarize. Leaving their bicycles chained and locked in an alley, they entered another residence but were surprised by the return of the owner and jumped out of a window. Cauley was then apprehended as described above. Defendant returned to the bicycles and was attempting to break the chain when he was likewise apprehended as described.

■■■ The principles governing the admissibilty and credibility of accomplice testimony are well recognized and have been so often stated by the Illinois courts as to need little reiteration here. Uncorroborated testimony of an accomplice is competent but the utmost caution is required when placing reliance on it alone. It is, however, sufficient to sustain a conviction if it satisfies the jury beyond a reasonable doubt. (*People v. Piehl* (1972), 6 Ill. App. 3d 296, 285 N.E.2d 612.) Infirmities in accomplice testimony such as promises or hopes of leniency or the hope of benefits from the prosecution go to questions of the weight of the evidence and the credibility of the witnesses. If the jury is satisfied by accomplice testimony that the defendant is guilty beyond a reasonable doubt, then the conviction should not be disturbed unless it is plainly apparent that such degree of proof is lacking. (*People v. Hansen* (1963), 28 Ill. 2d 322, 192 N.E.2d 359, *cert. denied* (1964), 376 U.S. 908, 11 L. ed. 2d 608, 84 S. Ct. 665.) Material corroboration of accomplice testimony is entitled to great weight. *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.

Defendant points to the facts that without Cauley's testimony there is no evidence that he stabbed Krech, that his fingerprints were not found on the premises, and that the knife, the supposed murder weapon, was never produced. There are, however, other facts in the record which corroborate Cauley. He testified that Krech was killed in her bed; photographs of the apartment show no evidence of struggle other than on the bed. He testified that he and defendant burglarized the apartment; Krech's purse was found at the laundromat nearby; only small items were taken from the apartment, indicating that the burglary was the work of juveniles, not professionals. He testified that the murder took place mid-morning on Sunday; the pathologist's protocol confirmed that as the approximate time of death. He testified as to the floor plan of the apartment; the sketch made by the police confirms such a layout.

Defendant contends that the foregoing shows that Cauley was in the

Krech apartment, a fact which Cauley admits, but does not place defendant there. However, Cauley gave other testimony which more clearly implicates defendant. Both Cauley and defendant admit being together the night and the morning before the murder as well as a short time thereafter. Cauley said that defendant obtained a ring bearing the word "love" from the apartment; defendant admitted to Officer Paoletti he took such a ring.

■■ We find that Cauley's testimony was corroborated in a significant manner and hence cannot be rejected. Defendant cites *People v. Marshall* (1975), 26 Ill. App. 3d 905, 326 N.E.2d 246. It is readily distinguishable. In *Marshall* the accomplice testimony was completely uncorroborated and was contradicted by a second accomplice.

So too, in the recent case of *People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291. In that case the supreme court reversed a conviction on account of the People's failure to sustain their burden of proof. The court pointed out that the accomplice testimony pointed to the "who" element of the offense, but the corroboration went to the "what." Additionally, the court stressed the failure of the victim to make identification of the defendant, and described the corroborative evidence as "tenuous at best."

In the case at bar, there obviously could be no identification made by the victim and corroboration in part comes from the defendant himself. It was much more than "tenuous."

Defendant further claims that Cauley's testimony is unreliable because he changed it so often during interviews with law enforcement officials. The record discloses that Cauley at first denied any knowledge of the burglary and murder, but later admitted his involvement. When first asked about the necklace, he denied it came from Krech's apartment; later he admitted that it did. In an interview on October 22, 1975, Cauley said that defendant had been with him in the apartment, but had not gone into the bedroom. On December 10, 1975, he talked for the first time about the stabbing and admitted putting pillows over Krech and said that defendant stabbed her. At trial Cauley testified that the police told him, "[I]f I wouldn't come out with the truth that they was going to put the murder charge on me."

Contrariwise, Officer DeMarco testified:

"We advised Mr. Cauley that we felt we had a strong case against him on the charge of murder, that we had a necklace that had been identified as being that of—of Gail Krech's, that Michael [defendant] was confronted with this necklace and he denied any knowledge of it, stated that the necklace was in Tom Cauley's possession and not his own. So we told him that we felt that under the circumstances and the physical evidence that we found at the

crime that he could not have committed the crime alone and that we felt that he should tell the truth as to who else was involved with him."

It can thus be seen that Cauley was not being given the choice of either implicating another or being charged alone with the crime. His choice was to be either charged alone or with someone else. In fact, at the time of trial Cauley was under a charge of voluntary manslaughter and this was made plain to the jury. The lesser charge is justified by less culpable participation. Cauley finally began telling the truth when it became in his self-interest to do so.

■■ The case at bar resembled *People v. Bolton* (1976), 35 Ill. App. 3d 965, 343 N.E.2d 190. In that case the court sustained murder convictions largely on accomplice testimony, although the accomplice gave at least three different versions of the facts and agreed to testify at trial in hopes of early parole. The *Bolton* court held that these were matters for evaluation by the jury. In the instant case the jury had all the facts before it and did not find Cauley's testimony implausible; nor do we.

In addition to all this, there are serious infirmities in defendant's own testimony. He admitted possession of a "love" ring and Cauley's possession of a necklace, but claimed that they had burglarized a first-floor apartment. During an interview defendant drew a sketch of the apartment which coincided in all important particulars with the police sketch. At the time of making the sketch defendant had been shown only the outside of Krech's apartment house. When asked why his sketch so resembled the victim's apartment, he said he didn't know. (Compare *Piehl*, where the court noted that not only was the accomplice testimony not without corroboration but also that defendant's testimony contained infirmities.)

Defendant's testimony reveals two other weaknesses. He maintained that Cauley had spent Saturday night before the murder with him, but that his mother had ordered Cauley to leave her home on Sunday morning and that he was not again with Cauley until sometime after the murder was supposed to have occurred. He did not call his mother, who was obviously more accessible to him than to the State, to corroborate the alleged separation. Defendant did call one Dale Fairconnetue, who had earlier made statements to the effect that he had seen Cauley with the necklace prior to the date of the murder. On the stand Fairconnetue recanted his statement.

We find that the defendant was proved guilty beyond a reasonable doubt.

Defendant next objects to the admission into evidence and display to the jury of certain photographs which he contends are gruesome and inflammatory. Specifically, he points to three color enlargments,

approximately 11″ x 14″, of photos taken of the body as it was found in the apartment; and four color slides taken in the pathology laboratory.

We note initially that the trial judge reviewed all photographs, including many not admitted into evidence, in chambers and made meticulous rulings on each of them.

The Supreme Court of Illinois has on many occasions held that photographs are admissible, regardless of their gruesome nature, if they are relevant to establish any fact in issue. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208, 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279, *reversed on other grounds* (1972), 52 Ill. 2d 284, 287 N.E.2d 699; *People v. Jenko* (1951), 410 Ill. 478, 102 N.E.2d 783.) The court has further held that photographs do not become necessarily cumulative because there is also oral testimony on the same issue. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.

Concerning the color enlargments, People's exhibit No. 11 showed the condition of the body which was important in determining the time of death and the force used; People's exhibits Nos. 16 and 19 depicted the various wounds and were relevant to show their number and location and to corroborate the pathologist's finding that death was due to internal bleeding. As to the slides, they were made before any autopsic incisions were made and thus differ materially from *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827, cited by defendant. The pathologist testified as to the manner in which each assisted him in answering questions concerning the cause of death.

■■ Defendant's principal objections appear to be that the photographs were cumulative because there was adequate oral testimony without them and because he had not objected to four others taken at the scene in the apartment upon discovery of the body. The first objection is answered by *Henenberg*; the second objection is only a boot-strap argument relating to degree, not principle.

■■ The admissibility of photographs is a matter within the sound discretion of the trial judge. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 725.) The record shows that in the case at bar he discharged that duty carefully and cautiously. We have reviewed the photographs and find no error in their admission.

■■ Finally, defendant complains about the length of his sentence and lays emphasis on his youth and possibility of rehabilitation. The day is long past when this court, or any court, should quiver like a pole-axed blancmange at the mention of youth and rehabilitation. These are proper considerations in the fixing of sentences, but they are not the sole elements. The nature of the crime, the protection of the public, deterrence and punishment have equal status in the consideration.

In the case at bar, the defendant had already been adjudged delinquent and was awaiting a dispositional hearing when this offense occurred. The crime itself was brutal, senseless and heinous. Defendant's cavalier attitude in stopping for a soda immediately upon the commission of a murder and then perpetrating a second burglary within hours tells even the casual observer what depravity must exist in his soul.

The books are full of more severe sentences than that imposed in the instant case. (Compare *People v. Lockett* (1972), 6 Ill. App. 3d 867, 286 N.E.2d 809 (60 to 100 for a 22-year-old); *People v. Glanton* (1975), 33 Ill. App. 3d 124, 338 N.E.2d 30 (40 to 100 and 50 to 100 for youthful gangsters); *People v. Sprinkle* (1974), 56 Ill. 2d 257, 307 N.E.2d 161, *cert. denied* (1974), 417 U.S. 935, 41 L. Ed. 2d 239, 94 S. Ct. 2650, (75 to 90 for 15 and 14-year-olds).) But sentencing is emphatically an individual matter and prior authority is of little assistance.

The record reveals that the trial judge conducted a conscientious sentencing hearing and took into account all factors required in imposing a proper sentence. His judgment will not be disturbed.

The conviction, judgment and sentence are affirmed.

Affirmed.

CRAVEN, P. J., and REARDON, J., concur.