THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ISAIAH GREEN, Defendant-Appellant.

Fourth District   No. 4—83—0554

Opinion filed July 12, 1984.

Daniel D. Yuhas and Jonathan Haile, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

Defendant, Isaiah Green, together with John Pickens and Dennis Scott, were charged by information in the circuit court of Sangamon County with the offenses of murder and armed robbery in violation of

sections 9—1(a)(1), 9—1(a)(2), 9—1(a)(3), and 18—2(a) of the Criminal Code of 1961. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), 9—1(a)(3), 18—2(a).) Defendant's case was severed from the others, and he was tried twice. The first trial ended with a hung jury and consequent mistrial. On the second trial, the jury returned general verdicts of guilty of murder and armed robbery. The trial court sentenced defendant to 15 years' imprisonment for armed robbery and to an extended term of 60 years' imprisonment for murder, the sentences to run concurrently.

On appeal defendant raises a variety of issues: (1) reasonable doubt, (2) double jeopardy, (3) evidentiary error in admitting prior consistent statements of Pickens and Scott, (4) plain error in the prosecutor's closing argument, (5) excessive sentence, and (6) improperly constituted jury.

Since the question of reasonable doubt has been raised, some recital of the evidence produced at the second trial is necessary. Further facts will be developed as needed for an understanding of the other issues in connection with those issues.

The victim was Fritz Havrilka, the owner and operator of Fritz's Wagon Wheel, a restaurant in Springfield. Pickens was a former employee of that establishment. At approximately 12:50 a.m. on December 12, 1982, Havrilka and the head waitress closed the restaurant and Havrilka got into his automobile to drive to his home in New Berlin, which is located about 8 to 10 miles west of Springfield. As was his custom, Havrilka took the night's proceeds from the restaurant with him in a paper bag.

Shortly before 1 a.m. on December 12, 1982, Kay Skerston, Havrilka's stepdaughter, and Mike Reichart, her boyfriend, were present in the kitchen of the Havrilka residence. Reichart and Skerston heard dogs barking outside. After the dogs had been barking for about five minutes, they heard five or six gunshots. They looked out of the window and saw a car sitting in the driveway. Its lights were off and the engine was running. Looking down the road, Skerston saw the taillights of a car driving away. The taillights were horizontal and appeared to belong to a large car. Skerston woke up her mother. Mrs. Havrilka called the sheriff's department. When she made the phone call she looked at the clock. It was 1:10 a.m.

When police officers arrived at the scene, they found Havrilka's body lying face-down in the driveway. An examination of the body showed that Havrilka had been shot five times with a .22-caliber weapon. The cause of death was a shot to the head which had probably been fired from a distance of six to eight inches. Four shots were

fired into the body. Expert testimony established that the wounds were consistent with a factual setting in which Havrilka was shot once in the face, fell to the ground, and was shot four more times as the assailant stood over him.

Four .22-caliber casings were recovered at the crime scene. All four cartridge cases exhibited extractor and ejector marks, used in semiautomatic or automatic pistols or any type of weapon that has only one chamber, such as a rifle. An examination of the bullets recovered from Havrilka's body established that the murder weapon could have been a Colt firearm.

Dennis Scott, an original codefendant, testified that on December 11, 1982, he spent the day with defendant and John Pickens. At about 8:30 p.m., they helped a friend, James Willie, set up equipment for a party in his apartment at the John Hay Homes in Springfield. At about 11:30 p.m., Scott, Pickens, and defendant left the party with Ruthie Scott. They drove around in Scott's automobile until they ran out of gasoline. They went to defendant's mother's house at about 12. Mrs. Green lent Pickens three dollars to buy gasoline. The four drove to Tommy Harris' house. Defendant went inside for about five minutes while the others waited in the car. Scott dropped Ruthie off and then drove with Pickens and defendant to Fritz's Wagon Wheel to pick up Pickens' paycheck. He was dismissed for failing to report for work.

Scott continued that he, Pickens, and defendant arrived at the Wagon Wheel just as Havrilka was pulling out. They followed. When Havrilka got outside of town, Scott began honking his horn and blinking the lights of the car. He pulled alongside of Havrilka, and Pickens asked Havrilka if he could have his job back. Havrilka told Pickens to come and see him on Monday morning. Pickens told Scott to continue to follow Havrilka. Scott followed Havrilka to his home and pulled into the driveway behind him.

Havrilka got out of his car and walked back to the passenger's side of Scott's car. Pickens grabbed Havrilka by his coat collar and held him as Green drew a gun and climbed out of the back seat. Scott backed out of the driveway, turned his car around, and moved 50 feet down the roadway. Meanwhile, Pickens, Havrilka, and defendant were engaged in a struggle next to Havrilka's car. Defendant climbed into the car and emerged with a paper sack. Defendant and Pickens walked away. Havrilka followed, yelling, "Give me back my money." Defendant turned and shot Havrilka once in the face. Havrilka fell to the ground; defendant shot four more rounds into the body.

Continuing, Scott testified that Pickens and defendant re-entered

the car and the trio drove away. Scott and Pickens asked defendant why he had shot Havrilka. Defendant responded that Havrilka knew Pickens and could identify him. Scott drove back into Springfield and stopped at a gas station. They filled the car tank with gas, using $21 of the money from the paper sack. They then returned to the John Hay Homes. Sometime between 2 and 2:30 a.m., after dividing the proceeds of the robbery, they returned to the party at James Willie's house, and stayed for about 2½ hours when, at defendant's insistence, they decided to drive to St. Louis.

In St. Louis, Scott sold his car to defendant. Defendant had paid Scott $150 on the car in August; while in St. Louis he paid him another $150 to close the deal. Scott and Pickens returned from St. Louis three or four days later by bus.

On cross-examination, Scott acknowledged that he owned two other cars besides the Cadillac which he drove on the night of the murder. Each of the other cars, a 1976 Chevrolet and a 1978 Buick Regal, had horizontal taillights, four to five inches wide. The Cadillac had vertical taillights which were only about two inches wide.

John Pickens, the other original codefendant, testified that in November and December 1982, he worked at the Wagon Wheel restaurant. On more than one occasion, he, Scott, and defendant had discussed plans to rob the restaurant. The last time they discussed such plans was on December 11 at about 6:30 p.m. According to the plan, Pickens was to drive; Scott and defendant were to go inside and rob Havrilka as he was closing the Wagon Wheel.

On the evening of December 11, Pickens, Scott, and defendant were present at James Willie's while preparations were made for a party. Scott, Pickens, and defendant left the party with Ruthie Scott at about 10:05 p.m. They drove around in Scott's Cadillac, Scott driving, and stopped by Tommy Harris' house at a little after 12. Defendant went inside for about two or three minutes while the rest of the party waited in the car. After dropping Ruthie Scott off, they drove to the Wagon Wheel restaurant.

Pickens continued: they arrived at the Wagon Wheel restaurant at about 12:30 or 12:40 a.m., and Havrilka was pulling out just as they arrived. They followed Havrilka to his home and pulled into the driveway behind him.

Havrilka walked back to the passenger's side of Scott's car. Pickens asked Havrilka if he could have his job back. Havrilka told him to come in on Monday morning.

Pickens, further testifying, stated that defendant stuck a gun out the window and told Havrilka that it was a "stick-up." Havrilka ran

back towards his car. Pickens opened the car door and let defendant out of the back seat. Defendant followed Havrilka and struggled with him next to Havrilka's car. Defendant took a paper bag out of Havrilka's car. As defendant and Pickens walked away, Pickens slightly ahead of defendant, Pickens heard a shot. He turned around as Havrilka was falling to the ground. Defendant fired several more shots into Havrilka's body. Pickens asked defendant why he had shot Havrilka. Defendant responded, "The man knew me." Pickens claimed that he never touched Havrilka during the robbery.

Pickens and defendant re-entered Scott's car. The car was parked at the end of the driveway, a little over 15 feet away from Havrilka's car. They drove back into town, and, after filling the car with gasoline, they split up the proceeds of the robbery, about $1,700. Scott and Pickens each received about $450 to $500. Defendant received more because he shot Havrilka. They went by Tommy Harris' house so that defendant could return the pistol which he had borrowed. Scott and Pickens each gave defendant $50 to pay Harris for the use of the weapon.

Pickens' further testimony was that he, Scott, and defendant returned to the party at about 1:50 or 2 a.m. A dance contest was starting just as they returned. The winner of the contest was awarded a fifth of Yukon Jack Whiskey, and defendant bought the bottle for $10. He, Scott, and defendant left the party at about 2:30 or 3 a.m. to drive to St. Louis.

In St. Louis, defendant bought Scott's Cadillac with money which he won as the three of them gambled together. Scott and Pickens retuned from St. Louis two days later by bus.

Vincent Cooper testified that he was at a party at James Willie's on the morning of December 12, 1982. Cooper testified that Pickens told him that Pickens and defendant had robbed a man. Pickens also told him that defendant had killed the man. Cooper testified that he did not see John Pickens at James Willie's party until 1:45 a.m. on December 12, 1982. Cooper shot dice with defendant at the party at about 3 a.m. and won $15 from him.

Tommy Harris testified that in December 1982 he lived at the John Hay Homes. Sometime in the latter part of November or first part of December 1982, Harris loaned defendant a .357 Magnum. Defendant never returned the gun. Harris eventually retrieved the weapon from defendant's cousin or uncle. Harris stated that on the night James Willie gave a party, defendant came to the Metro, a tavern in Springfield, and asked to borrow the Magnum again. Harris refused to loan defendant the Magnum but told him he could loan him

a .22-caliber Colt automatic pistol. Defendant agreed and went to Harris' home to get the weapon. When defendant returned the gun, he paid Harris $100. Harris guessed defendant returned the gun two or three days later and did not think it was returned the same night he loaned it. On cross-examination, he admitted testifying at defendant's first trial that he could not recall the specific date in December when he loaned defendant the gun.

Defendant, testifying on his own behalf, stated that he was not involved in either the robbery or the murder of Fritz Havrilka. He testified that he arrived at James Willie's party at about 8:30 p.m. He went home at about 10 or 10:30 p.m. to change clothes and check on his son and was not gone more than about 20 minutes. There was a dance contest held at the party. Shortly before it began, defendant attempted to go to the liquor store. Sam Bailey was to drive Robert Joiner's car. Joiner did not want defendant to drive the car since he did not have a license. They did not go because Sam Bailey realized that it was too late to go. The liquor store was closed. They returned to the party and the dance contest shortly thereafter. Defendant testified that the winner of the dance contest, Salina Cave, sold him a fifth of whiskey which she received as a prize from the contest. At about 2:30 or 3 a.m., defendant left the party. He, Pickens, and Scott drove together to East St. Louis. The three apparently continued their drive to St. Louis because defendant claimed that he gambled with Scott and Pickens there. With his winnings, he purchased Scott's Cadillac. Defendant attested that Scott and Pickens were with him when he borrowed a gun from Tommy Harris sometime in December. Defendant persuaded Harris to loan him the weapon for protection because several men were threatening him with a gun.

On cross-examination, defendant admitted that he testified at his first trial that he went to sleep in the back seat of Scott's car as soon as they left Springfield for St. Louis. He also acknowledged testifying previously that he borrowed the gun from Harris because someone had threatened him with a knife.

Salina Cave testified that the dance contest at James Willie's party commenced at about 1:30 a.m. on December 12 and lasted approximately 30 minutes. She did not see defendant, Pickens, and Scott until after the dance contest ended. Cave received a bottle of Yukon Jack for winning the dance contest. Defendant offered to buy the liquor from her for $8.

Sam Bailey testified on behalf of defendant. Bailey was the doorman at James Willie's party. At about 1:15, defendant asked Bailey to take him to the liquor store. They were to go in Robert Joiner's car.

Robert Joiner testified that he lent his car keys to defendant. Bailey testified that he and defendant walked out to Robert Joiner's car, which was parked about 15 feet from the door to the party. Bailey looked at his watch and told defendant that there was no point in going to the liquor store because it was closed. Bailey testified that he and defendant returned to the party just before the dance contest started.

Defendant's sister, Diane Green, testified on rebuttal that her sister reported defendant came home at midnight on December 11, 1982, to borrow $3 from his mother.

Ruthie Scott testified on rebuttal that defendant transported her to her cousin's house in Dennis Scott's Cadillac at about 10:45 p.m. on December 11, 1982. Defendant stopped at his mother's house for about 15 minutes to get some money for gasoline. Scott, Pickens, and defendant left her at her mother's house between midnight and 12:30 a.m. before they purchased gasoline.

Rebuttal witness Detective Tom Murphy testified that on December 22, 1982, defendant informed him that on the night of the party he walked to Alby's Liquors by himself but returned because it was closed.

That was substantially all the evidence in the case. Defendant's chief argument concerning reasonable doubt centers on the testimony of Scott and Pickens, his codefendants. He notes (1) that they were substantially rewarded for their testimony, and (2) that their stories are inconsistent and unbelievable.

The record does demonstrate that each of them entered pleas of guilty to the offense of armed robbery and each received a prison sentence of 15 years therefor. Murder charges against them were dismissed. Defendant contrasts this with his 15-year term for armed robbery and 60-year term for murder. However, the jury was thoroughly informed of the lenity which had been extended to Scott and Pickens and was instructed as to how to deal with the testimony of accomplices. Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.17 (2d ed. 1981).

█ The principles governing the use of accomplice testimony are familiar. Uncorroborated testimony of an accomplice is competent but received with caution. (*People v. West* (1977), 54 Ill. App. 3d 903, 370 N.E.2d 265.) Infirmities in such testimony, such as hopes of leniency or reward, go to the credibility of the witness and his testimony, not to its admissibility. If the jury is satisfied by such testimony that the defendant is guilty beyond a reasonable doubt, then a reviewing court should not disturb the verdict unless it is plainly apparent that such a

degree of proof is lacking. (*People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422; *People v. Hansen* (1963), 28 Ill. 2d 322, 192 N.E.2d 359.) Material corroboration of accomplice testimony is entitled to great weight. *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.

■ As we have already noted, the jury was informed of the status of Scott and Pickens and knew of the lenity which had been extended to them. Without rehashing all of their testimony set forth above, we find that it is largely parallel and corroborated by other evidence. Both testified that defendant was in their company almost constantly throughout December 11 and 12; their versions of the shooting parallel: that there was a single shot to Havrilka's head and then additional rounds into his body after he fell to the ground. While there were minor discrepancies concerning times and locations both before and after the shooting, the immediate events at the time of the homicide were described consistently. Furthermore, the testimony of the pathologist and the firearms expert, which was received during the trial, concerning the number and location of the wounds, the type of weapon used, and the range from which it was fired, was entirely consistent with the testimony of the accomplices.

Most telling, however, was the testimony of Tommy Harris, who stated that he had loaned defendant a .22-caliber Colt automatic on the night of the party at James Willie's house and received $100 from defendant for its use when he returned it. The firearms expert testified at trial that the bullets recovered from the body of Havrilka and at the scene more likely than not came from a Colt firearm.

We find no basis for disturbing the jury's verdict on this record.

■ Defendant's issue of double jeopardy arises out of events which occurred at his first trial. A jury was selected on May 16, 1983, and evidence commenced the next day, May 17, and continued through May 18. On May 19 the jury returned for closing arguments and instruction. The record does not reflect the hour at which they retired to consider a verdict. However, shortly before 5 p.m. on May 19 the trial court returned the jury into open court and the following colloquy took place:

"THE COURT: The Court wishes to inquire if you're making any progress.

Without telling me how you stand, are you making progress?

FOREMAN OF THE JURY: I can't tell you that we're nearing—I feel that we're making progress, but I can't tell that we're reaching—that we're coming close to reaching a decision.

THE COURT: Do you think that if you have additional time you could reach a decision?

FOREMAN OF THE JURY: I think it's entirely possible.

THE COURT: Do you have an indication of how much more time you'd like?

FOREMAN OF THE JURY: I can—I'm quite sure that it will be more than a couple of hours, but beyond that I can't say and I can't—I can't predict what will happen after two hours.

THE COURT: But you feel that you are making sufficient progress, that more time may assist you in arriving at a verdict?

FOREMAN OF THE JURY: Yes.

THE COURT: All right, take the jury back."

The jury was allowed to continue its deliberations until shortly before 8 p.m. When the jury was returned to the courtroom, the foreman stated that he believed they were making progress toward reaching a verdict. The court then gave them the *Prim* (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601) instruction.

The jurors were recalled to the courtroom a third time. The court determined that they had reached an impasse:

"THE COURT: Court's in session. Mr. Foreman, since our last time out here have you made any more progress at all?

FOREMAN OF THE JURY: I would say that we're making very slow progress.

THE COURT: Do you think if you had more time that you would be able to reach a verdict?

FOREMAN OF THE JURY: I think that if we have enough time I think it's probable that we would be able to reach a verdict.

THE COURT: What are you talking about, 'time?'

FOREMAN OF THE JURY: I—I can't say. Right now—.

THE COURT: Don't tell me in numbers.

FOREMAN OF THE JURY: Uh—yes. Uh-right now we're all very fatigued from all the discussion and deliberation, and our thoughts and discussions are going very, very slowly.

It seems that we've been making some progress in the last few minutes—hour—.

THE COURT: But you are fatigued, aren't you?

FOREMAN OF THE JURY: Yes.

THE COURT: It's this Court's opinion that you've had this case for approximately eleven hours, and it was a short trial, two-day trial, and I feel that because of fatigue setting in that

it would be improper to let you continue discussing this case any more.

This Court's going to declare a mistrial and discharge the jury."

Defendant argues that the trial court was too hasty in declaring a mistrial; that the record indicates that the jury was about to reach a verdict; that no reason existed why, if the jury were fatigued, it could not be sequestered overnight and resume deliberations the next day.

The rule governing a declaration of mistrial by a court *sua sponte* was first laid down in *United States v. Perez* (1824), 22 U.S. (9 Wheat.) 579, 6 L. Ed. 165, and has been generally followed ever since. In that case the Supreme Court stated that a mistrial resulting from a hung jury did not bar retrial and that a court may not declare a mistrial without the consent of the defendant unless there is a manifest necessity for the act. The court cautioned that the trial judge should exercise sound discretion on the subject.

In the case at bar we are of the opinion that the matter has been waived by the defendant. He raised no objection at the time of the declaration of mistrial, and more significantly, he raised no objection at the start of the second trial. Defendant misconceives the nature of double jeopardy. The prohibition is not against double punishment, but against being put twice in jeopardy. (*Ball v. United States* (1896), 163 U.S. 662, 41 L. Ed. 300, 16 S. Ct. 1192.) It is thus incumbent that the question be raised before the second trial commences. It is at this time that jeopardy, if at all, will attach.

■ Even if the matter were to be considered on its merits, we could find no abuse of discretion by the trial judge. It is apparent that the jury was making little, if any, progress; the issue was straightforward—credibility. Compare *People v. DeFrates* (1946), 395 Ill. 439, 70 N.E.2d 591, where after 45 minutes of deliberation following a three-day trial, a mistrial was declared. The supreme court indicated that it thought the trial judge had acted hastily but refused to interfere with his discretion.

■ Defendant's next issue concerns the admission into evidence of prior consistent statements made by his accomplices, Scott and Pickens. These were recounted by two detectives who took the statements from them on December 22, 1982. The statements were substantially parallel to their trial testimony.

The general rule is that a prior consistent statement may not be introduced to bolster the in-court testimony of a witness. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) There are some limited exceptions: (1) it may be introduced to refute a charge that the in-

court testimony is of recent fabrication; or (2) if it is contended that the witness has a positive motive to testify falsely, it may be introduced to show that the witness told the same story when the motive did not exist. *People v. Tidwell* (1980), 88 Ill. App. 3d 808, 410 N.E.2d 1163.

Defendant's contention is that the motive to testify falsely arose before the statements were made to the police. On December 22, when the statements were made, the investigation had centered upon Scott, Pickens, and defendant through information "leaked" to the police from the John Hay Homes, a housing project where they resided. We agree. At that time it must have been apparent to them that they were prime suspects and faced with criminal liability for armed robbery and murder. The motive to place the onus on defendant must have been present.

It follows that the statements were inadmissible and it was error to allow them in. However, it does not follow that the error was of such magnitude as to require reversal. It will be recalled that a statement to Vincent Cooper, a guest at the Willie party, was also made on the night of the homicide by Pickens. He told Cooper that defendant had robbed and killed a man. Clearly, no motive to falsify existed at that time, and the statement to Cooper was thus admissible. Defendant argues that the falsification arose immediately upon the homicide; that Scott and Pickens concocted the entire story at that time. The argument is purely speculative and self-serving.

Since the statement to Cooper was properly before the jury, the further statements to the police, although inadmissible, could have had little measurable impact on the verdict. We conclude that the admission of the prior consistent statements to the police was error, but harmless error.

■ Defendant next complains that numerous statements made by the prosecutor in his closing argument constitute plain error. Initially we note that this contention is raised for the first time on appeal. Generally, unless objection is made at the time and in the post-trial motion, error in closing argument is considered waived. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.) An exception to the rule is that of plain error, but such error may be noticed for the first time on appeal only where the evidence is closely balanced and of such magnitude that the defendant was deprived of a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.

We have examined with care the portions of the argument cited to us, and while we find most of them inappropriate and ill-advised, we do not find plain error. The most troublesome of them are the re-

peated statements that defendant was a liar. Some examples taken from the record are:

> "Either this man [defendant] was at a party the whole time or he has tried to build an alibi to cover a murder he committed. There is no middle ground here. Either he's a partier or he's a murderer. He's either telling you the truth or he isn't.

> * * *

> So even consider *** the way this man [defendant] lied to you, because he has been shown to be a liar time after time in his testimony.

> Let's look at the truth that you heard in here and let's look at the lies he told you.

> * * *

> He lied about when he left the party and he lied about leaving the party.

> * * *

> Every time Isaiah Green tells a story of what happened that night he tells it different, because every time he tells it he gets caught in another lie. And every time he gets caught in another lie he sits up there and he tries to get out of it by saying, 'You never asked me that,' or 'I don't recall that,' or this or that.

> It's like if he sits up there and wriggles around he can make his lies become truth; he can catch the truth someplace in the air.

> But he can't because he's a — he's lying, and we've shown him to be a liar at every turn he takes.

> * * *

> I'd like to plant a concept with you and I'll get back to it a little later.

> It's not original with me. It involves a term that really is not very often in my vocabulary, but I think it fits. It applies to human nature today as well as it did in 35 A.D. when the Roman statesman Marcus Quintillian said, 'A liar should have a good memory. A liar should have a good memory.'

> * * *

> So he told us two completely different stories about even how he got his grub stake to get into the [dice] game.

> A liar should have a good memory if he's going to get away with it.

> * * *

> Now, other telling points that I'd like you to consider is the matter of his statement that he didn't leave that party from be-

fore 11:00 until after 1:00. If you believe that, he's a party-goer. If you don't believe that, he's a murderer.

\* \* \*

A few more telling points on the issue of truth. A liar should have a good memory.

'Why did you get the gun the first time from Tommy Harris?'

'Well,' he says, 'the first time he told us he said somebody was after him with a knife.'

Story B: 'Because some guys were after me with a gun.'

'Okay, how about the trip to East St. Louis? How'd that go?'

Okay, the first time he says, 'I went to sleep right when we left Springfield.'

Yesterday he tells us, 'Well I drove down by Litchfield.'

'What was the condition of your sobriety?'

He told Tom Murphy in December he was drunk. He told us yesterday he was sober.

\* \* \*

A liar, Mr. Green, should have a good memory.

\* \* \*

A liar should have a good memory. Fortunately, for justice in our community Isaiah Green does not have a good memory."

While we will not be understood as condoning these remarks, they have some basis in the record. Defendant's testimony was largely discredited by the State's witnesses and he himself was impeached with his prior inconsistent statements. In this context, the instant case is distinguishable from *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880. In that case the prosecutor called the defendant a habitual criminal when it was undisputed that he had no criminal record and also stated that the judge knew that the defendant was guilty. No such flagrant allegations were made here.

■ Defendant's remaining issues may be dealt with somewhat more summarily since they attempt to plough legal ground which is already well tilled. He claims that an extended term on the murder conviction was an abuse of discretion, arguing that there was nothing about this homicide to set it apart from any other. He also points to his age, 18, and his lack of prior convictions, arguing that the sentence ignores his potential for rehabilitation.

Under section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2)), a trial court may impose an extended sentence if it finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. In *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344,

the supreme court stated that the statutory requirement did not demand torture or unnecessary pain upon the victim. The court stated:

> " 'Heinous' is defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' " 88 Ill. 2d 482, 501, 431 N.E.2d 344, 353.

We believe that the facts in the instant case fit within this definition. The defendant talked about the robbery only hours before the crime occurred and obtained a firearm in order to insure its success. As Havrilka lay on the ground, mortally wounded, the defendant fired off four more rounds into his body. He left Havrilka's body in a place where his family was certain to view it in a gruesome state. He received an extra portion of the proceeds of the robbery for having been the trigger man. He committed the homicide only to obscure identification of himself as the robber—a most senseless and wanton act.

We find no basis for interfering with his sentence.

Finally, defendant argues that the prosecution's use of peremptory challenges to exclude black jurors deprived him of equal protection and of a jury representing a fair cross-section of the community. Thirty-eight jurors, two of whom were black, were examined; six were peremptorily excused by the State, including the two blacks; one of the blacks was excused when she revealed that her sister had been charged with forgery in Marion County. The jury was all white, the defendant was black, the victim was white.

Defendant accepted 12 jurors without objection. Defense counsel made a short statement for the record which only summarized the composition of the panel and the peremptories used by the State, all as detailed above.

This issue has been adversely decided to the defendant by the supreme court in *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202, where the court held that the use of peremptory challenges to exclude black jurors does not offend equal protection unless it can be shown that there was a systematic and purposeful exclusion of blacks from the venires in case after case. There was no such showing in *Payne* and there has been none here. The argument is without merit.

For all the foregoing reasons, the judgment and sentence of the circuit court of Sangamon County is affirmed.

Affirmed.

MILLS, P.J., and GREEN, J., concur.