THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SHARON NIETO, Defendant-Appellant.

Fourth District   Nos. 4—87—0060, 4—87—0129 cons.

Opinion filed October 29, 1987.

438

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klinger, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE SPITZ delivered the opinion of the court:

On August 28, 1986, an indictment was filed charging Sharon Darlene Nieto with both the knowing and the intentional shooting death of Johnny Lee Willis which occurred on April 6, 1977, nine years earlier. Lee Albert Vine was also indicted with Nieto. Defendant Vine filed a motion for severance alleging the likelihood that he and Nieto would assert antagonistic defenses. Vine pleaded guilty to one count of murder on December 11, 1986, and was immediately sentenced to 24 years' imprisonment in the Department of Corrections.

On December 15, 1986, a jury trial commenced in Nieto's murder case. Previous codefendant Vine was one of the principal witnesses to testify against Nieto. Vine testified that he, along with Robert Fertner, had killed Johnny Lee Willis by shooting him in the back of the head. At the time of the killing, Vine was a medical service specialist at Chanute Air Force Base. Vine testified that Fertner, his roommate, who was also in the service, rode with Vine in Vine's pickup truck south of Rantoul to rendevous with a car driven by Nieto in which Willis was a passenger. Vine stated that he had previously agreed to kill Willis with Fertner and with Nieto, who was also in the Air Force.

Vine further testified that he had first met Nieto as a patient in the base hospital, and that he met her again through a friend of Fertner's, who knew that Nieto had "boyfriend problems" and wanted them resolved. Vine could not recall with specificity how long before the shooting he and Nieto made their agreement. According to Vine's testimony, it could have been "days or weeks." He testified that he asked if Nieto wanted Willis dead, and that she said yes.

Vine stated that he, alone, planned the killing and all the details of how it would occur. He had never met Willis before the night of the shooting. He testified that he had told Nieto to drive Willis to a predesignated location near Rantoul, and that Nieto complied with this order. According to Vine's testimony, he and Fertner waited along the way on a side road north of Route 136 near a bridge. Vine testified that when Nieto drove by, he and Fertner crossed Route 136 and followed her out into the country. Vine testified that he had attached a revolving red light to his truck so that Nieto would stop her car.

Once the car had stopped, Vine testified that while armed with his shotgun, he approached Willis and said, "Look who we have here." Simulating police action, Vine ordered Willis out of the car and told him to put his hands on the roof of the car to be searched. Vine testified that he then told him to lie down on the ground. When Willis complied, Vine shot him in the head. Vine testified that after shooting Willis, he told Nieto to go home, she left, and he and Fertner returned to his truck and drove away.

Vine further testified that he believed he had been paid approximately $100 or $150 for his agreement to kill Willis, but that he could not recall the exact amount or even if that money had been paid, because Fertner handled that part. He recalled that he and Fertner had been promised $200 each by Nieto, but he could not remember if either ever received the rest of the money because he "wasn't interested in it." Vine testified that his motivation for the killing was not really money. His motivation for killing Willis was an Air Force inspired "us versus them" mentality combined with a desire to test his own emotional resolve.

Vine testified that he recalled seeing Nieto twice after the shooting, once when she was a patient in the hospital and once when he bought used furniture from her. Vine could not identify Nieto in court at her trial.

Vine further testified to the terms of his guilty plea agreement. He pleaded guilty to the offense of the murder of Johnny Lee Willis and was sentenced to a term of 24 years' imprisonment in the Department of Corrections.

Under questioning by the defense, Vine stated that in the trailer he shared with Fertner he kept the shotgun used in the murder, a couple of rifles, and a few handguns. Vine testified that Fertner owned a double-barreled shotgun, a .22, a high-powered rifle, and some handguns, and that on the night of the murder, Fertner was armed with his loaded double-barreled shotgun and .44 magnum. Vine

testified that he had observed Fertner playing violent fantasy "soldier of fortune" games three or four times a week, in which he would shoot an unloaded gun or wave a bayonet at imaginary enemies in the trailer.

Further cross-examination of Vine revealed that he had been questioned by the police within days of the shooting. The police read Vine his rights, told him that they wanted to discuss the victim's death, and then asked Vine why he had killed Willis. Vine said his voice cracked, and he denied the accusation. Vine refused to take a polygraph examination. He said he had no idea why he had been investigated in connection with Willis' murder at that time. Vine was not questioned again about the killing until nine years later, when he was arrested in Ohio. Arresting Officer Fletcher asked him if he knew "Sharon," and Vine replied in the negative. After being transferred to Champaign and before pleading guilty to murder, Vine read police reports which included Fertner's statements that implicated Nieto. Vine acknowledged that if he had not testified against Nieto, he would not have been able to secure his plea agreement.

Robert Fertner also testified for the State concerning the events on the night in question. At that time, he was a medic at the Chanute Air Force Base hospital and lived with Lee Vine off base in a mobile home. He testified that he accompanied Lee Vine when Vine killed Johnny Lee Willis on a country road outside of Rantoul. His testimony was similar to Vine's about the details of the killing, but Fertner added that Vine used a spotlight in addition to the flashing red light to get Nieto to stop her car. Fertner testified that he left Vine's truck while Vine posed as a police officer, and that Nieto was "half in" and "half out" of her car when Vine made Willis lie down on the road and shot him. Fertner testified that he was armed that night with a loaded military revolver.

Fertner was able to identify Nieto in court at the trial. He testified that he had met Nieto shortly before the killing and she had discussed with him her problems with Willis. According to Fertner's testimony, Nieto said she wanted Willis out of her life, Vine asked her if she wanted him dead, and Nieto responded affirmatively. Fertner testified that he had never met Willis before the shooting. A few days before the shooting, Fertner thought Nieto agreed to pay $200 for the killing.

Fertner testified that after the incident, he went into shock and kept repeating "is he," referring to the death of Willis. Fertner said he participated in the shooting of Willis because of Fertner's strong friendship with Vine, his mentor, to whom Fertner was a "naive" and

"faithful sidekick." Fertner testified that he was also on antitubercu-lin medications on the night of the murder, which he surmised may have caused "mental confusion" and affected his judgment that night.

Fertner also testified that Nieto made an attempt to pay Vine and Fertner shortly after the shooting, extracting from a jar of change some coins which she wrapped in aluminum foil. Fertner testified that he was not interested in receiving full payment. He could recall no further conversation with Nieto about the killing, other than her thanking Fertner and Vine when she paid them from her coin jar. Fertner had seen Nieto several times after the incident and had en-gaged in one sexual encounter with her.

Fertner confirmed that he was given immunity from prosecution in this case in exchange for his testimony. Shortly after the killing, Fertner testified that he had been questioned by the police and had then denied any knowledge of the event because he was scared.

During cross-examination, Fertner testified that Vine did all the planning of the murder and that Fertner merely acceded to Vine's plan. According to Fertner, they received no payment of $150 from Nieto before the shooting. He did not recall his and Vine's waiting on a bridge for Nieto's car to pass.

Jeannie Vine testified for the State that she is the estranged wife of Lee Vine. She married Lee Vine on August 13, 1977, a few months after the murder of Johnny Lee Willis. Jeannie Vine testified that both before and after her marriage to Vine, he talked to her about the murder and said that Robert Fertner and "Sharon" were in-volved. Jeannie Vine testified that Lee Vine had told her that Fertner was with him when the murder was committed. Jeannie Vine further testified that Sharon "had been part of the arranging of having Willis be at a certain place at a certain time."

Under questioning by the defense, Jeannie Vine disclosed that when Vine first told her about the murder, before their marriage, she did not report it to the police, nor did she make a police report within six months of her marriage, when Vine next talked to her about the murder. The first time she talked to the police was more than nine years later, during the course of her contested divorce proceedings from Vine. Although Vine had told her details of the murder nine years earlier and that Sharon had driven Willis to a prearranged loca-tion, Jeannie Vine could not recall whether he had said "Sharon" had been present at the site where and when Willis was shot.

Champaign County Detective Kent Fletcher testified that on July 2, 1986, he spoke with Jeannie Vine, and that on July 21, 1986, he spoke with Robert Fertner. As a result of these interviews, he ob-

tained and executed a search warrant for Lee Vine's home in Ohio, at which place he seized a Westernfield 12-gauge shotgun, a portable spotlight and 18 shotgun shells. FBI Special Agent John P. Riley testified as an expert witness on neuron activation analysis. He conducted tests and concluded that the shot pellets removed from Johnny Lee Willis' body in 1977 came from the same source of lead as one of the shotgun shells seized from Lee Vine's home in Ohio in 1986, or they came from another source of lead having the same exact composition, most likely from the same manufacturer on or about the same date.

Dr. Stanley Bobowski was the pathologist who performed the autopsy on Johnny Lee Willis. He testified that the decedent died from a wound to the brain inflicted by a shotgun.

Champaign County Sheriff Joseph Brown testified for the State that at approximately 9 p.m. on the night in question, he investigated the shooting of Willis. He arrived at the scene and removed and inspected a wallet from Willis' body. Having thus been able to identify the name and address of the decedent, Brown went to the decedent's residence and inspected it. He located addresses and phone numbers and later called Willis' sister, sister-in-law, and mother in Mississippi.

Brown testified further that after making these phone calls, at approximately 2 a.m. the next day he and Sergeant Bunetta, OSI Agent Peeva and David Gas from the Rantoul police department went to Sharon Nieto's residence to interview her. Nieto admitted that she knew the decedent and had lived with him until the last two or three months. Nieto told them that the last time she had seen the decedent had been at 8:30 p.m. the night before. According to Nieto, Willis had called her and asked for transportation to Gibson's department store. She stated that she had picked him up in her car at a Mister Donut shop and had driven him to Gibson's. Brown doubted if he could now recognize Nieto.

Questioning by defense disclosed that in 1977, Brown had been a supervisor of Sergeant Bunetta, who had since died. Bunetta had made reports on this shooting incident, but only orally. While at the decedent's residence, Brown had telephoned Pearl Mitchell, Willis' sister, in Mississippi and she had informed Brown that the decedent had lived with Nieto for several months and that Nieto had a young boy. Brown's report indicated that Nieto owned a 1976 silver Chevrolet Vega station wagon. Brown assigned Sergeant Bunetta to follow up on the interview with Nieto. Bunetta told Brown that he had not found any new evidence after interviewing Nieto and that her later statements to him were the same as those given at the first 2 a.m. interview.

Champaign County Coroner Tom Henderson testified for the State that he convened an inquest on the death of Johnny Lee Willis and he authenticated a copy of the transcript from that inquest. By stipulation, Nieto's testimony from that inquest was published to the jury. According to the transcript, Nieto had testified that she was an "admin specialist" at Chanute Air Force Base and had known the decedent for approximately one year. She stated that the first time she had seen the decedent on the day of his death was at his house at approximately 6 or 6:30 p.m. They were there only a few minutes before Nieto drove Willis to the base. She then went to a gas station and then home, and shortly after 8 p.m., she received a telephone call from Willis asking her to pick him up at Mister Donut and to drive him to Gibson's department store. Nieto stated that after driving Willis to Gibson's, on Route 136 in Rantoul, she returned home. She claimed that she had no other conversations or meetings with Willis. The coroner commented after her testimony that Nieto had appeared voluntarily as a witness at the inquest.

The State then rested. The defense presented no evidence. After deliberations, the jury found defendant guilty of murder and judgment was entered on the verdict.

After denying defendant's motion for a new trial, the court sentenced defendant on January 26, 1987, to 25 years' imprisonment in the Department of Corrections. Notice of appeal was filed the next day and the office of the State Appellate Defender was then appointed to represent Nieto.

On February 13, 1987, Nieto filed a motion for sentence reduction or modification, which was denied on February 19, 1987. Notice of appeal from the denial of this motion was filed that same date and the office of the State Appellate Defender was again appointed to represent Nieto. These appeals were consolidated on Nieto's motion by order entered on March 30, 1987.

■■ The first argument raised by defendant on appeal is that she was not proved guilty of murder beyond a reasonable doubt because her conviction was based upon the testimony of two accomplices "whose testimony was premised upon promises of leniency from the State." We find no merit to this contention.

The principles governing the use of accomplice testimony were fully set forth in *People v. Jackson* (1986), 145 Ill. App. 3d 626, 639-40, 459 N.E.2d 1207, 1218, wherein the court stated:

"The uncorroborated testimony of an alleged accomplice is sufficient to warrant a conviction, and the fact that the accomplice is a self-confessed criminal and expects leniency does not, of it-

self, raise a reasonable doubt. (*People v. Cowherd* (1980), 80 Ill. App. 3d 346, 349, 399 N.E.2d 672.) The existence of a promise of leniency goes to the credibility of the witness and his testimony, not to its admissibility. Thus, a beneficial plea-bargain agreement is not sufficient reason for an accomplice's testimony to be unworthy of belief, especially where the jury has resolved the issue of credibility by its verdict. (*People v. Reed* (1982), 108 Ill. App. 3d 984, 991, 439 N.E.2d 1277.) Moreover, if such testimony satisfied a jury that the defendant is guilty beyond a reasonable doubt, then a reviewing court should not disturb the verdict unless it is plainly apparent that the necessary degree of proof is lacking. *People v. Green* (1984), 125 Ill. App. 3d 734, 741-42, 466 N.E.2d 630.

However, our supreme court has held that uncorroborated accomplice testimony must be carefully scrutinized on appeal, and furthermore, where a witness expects leniency for testifying, that 'testimony should not be accepted unless it carries within it an "absolute conviction of its truth." [Citation.]' (*People v. Ash* (1984), 102 Ill. 2d 485, 493, 468 N.E.2d 1153.) A reviewing court may not substitute its judgment as to the weight of the evidence or the credibility of witnesses, but will reverse only if the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt as to defendant's guilt. *People v. Winfield* (1983), 113 Ill. App. 3d 818, 826, 447 N.E.2d 1029."

We first note that the fate of defendant's two accomplices was fixed prior to defendant's trial. Vine had already been sentenced to a term of 24 years' imprisonment based on his plea of guilty to the charge that he murdered Johnny Lee Willis. Fertner had already been granted immunity from prosecution in return for making a complete statement and testifying at defendant's trial. Although either of defendant's two accomplices could have been prosecuted for perjury if their testimony at defendant's trial was inconsistent with their previous statements implicating defendant, neither of the accomplices could directly improve their positions based on their trial testimony.

The situation present in the instant case is in direct contrast to *People v. Williams* (1976), 65 Ill. 2d 258, 357 N.E.2d 525, and *People v. Hermens* (1955), 5 Ill. 2d 277, 125 N.E.2d 500, two cases relied upon by defendant on appeal. In *People v. Williams*, the key witness had been convicted and sentenced to 15 to 20 years' imprisonment for his part in the same murder Williams was charged with. After he had spent two years in prison, he was offered a promise by the State to seek executive clemency, to have his sentence reduced to three years,

and to recommend to the Pardon and Parole Board that he be released immediately after he testified. The Illinois Supreme Court found that his credibility was limited since he had agreed to testify only after being promised immediate release. Similarly, in *Hermens*, the key witness' application for probation was pending at the time of his court testimony. The Illinois Supreme Court concluded that the witness' hope of a reward from the prosecution, together with several other errors which occurred at trial, required a reversal and remandment of the case.

*Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, another case relied upon by defendant, is also inapposite to the instant appeal. In *Lee*, two codefendants both gave signed confessions regarding their involvement in two murders. One bench trial was conducted to consider the charges against both defendants, and neither defendant testified, except on behalf of their respective motions to suppress their statements. In finding Lee guilty of both murders, the trial court expressly relied upon portions of Lee's codefendant's confession. The United States Supreme Court held that the trial court's reliance upon the codefendant's confession as substantive evidence against Lee, without the opportunity to cross-examine the codefendant, violated her rights under the confrontation clause of the sixth amendment. In the instant case, defendant had every opportunity to cross-examine the two accomplices who testified against her, and she took full advantage of this opportunity. Thus, *Lee* is readily distinguishable from the instant case, and offers no support for defendant's position on appeal.

In the instant case, defendant's conviction was based upon the testimony of two accomplices whose testimony regarding defendant's involvement in the murder was consistent in all important respects, as well as the corroborating testimony of Jeannie Vine, certain circumstantial evidence, and defendant's own statement at the coroner's inquest which placed defendant in the vicinity of the murder shortly before the murder occurred, as confirmed by the pathologist's testimony. The testimony of Jeannie Vine is particularly important. As this court stated in *People v. Green* (1984), 125 Ill. App. 3d 734, 742, 466 N.E.2d 630, 635:

> "Material corroboration of accomplice testimony is entitled to great weight. *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1."

Jeannie Vine testified that Lee Vine told her in the latter part of 1977 that a woman named Sharon and Robert Fertner were involved with him in a murder which occurred in Rantoul earlier in 1977. Jean-

nie Vine further testified that Lee Vine had told her that Sharon had hired Fertner and Lee Vine to commit the murder, and that Sharon participated in the murder by having the victim at a certain place at a certain time. Jeannie Vine's testimony is consistent with the testimony of Lee Vine and Fertner in all significant aspects. There is no apparent motive for Jeannie Vine to have implicated defendant in the killing of Johnny Lee Willis. We conclude that Jeannie Vine's unimpeached testimony that Lee Vine told her of defendant's involvement in the murder of Willis in 1977 effectively negates defendant's argument that Fertner and Lee Vine recently fabricated their testimony that defendant hired them to kill Willis.

Defendant cites *People v. Price* (1974), 21 Ill. App. 3d 665, 316 N.E.2d 289, for the proposition that the backgrounds of defendant and her accomplices should be compared, and that when this is done, the accomplice's testimony should be given little weight. However, as the State points out, the backgrounds of all three participants in the Willis murder show little indication of criminal mentality or that they would be likely to be involved in a murder. None of these participants had any prior criminal convictions. At the time of this murder in 1977, defendant was an administrative specialist in the United States Air Force and assigned to Chanute Air Force Base. Lee Vine was a medical technician in the Air Force in 1977, also assigned to Chanute Air Force Base. Robert Fertner was a medic at the Chanute Air Force Base hospital in 1977, and is now a registered nurse in Wichita, Kansas. We agree with the State that the backgrounds of these three accomplices are similar, and there is no apparent reason on the basis of their background alone to believe one person over the other.

■ As this court stated in *People v. Green* (1984), 125 Ill. App. 3d 734, 741-42, 466 N.E.2d 630, 635:

> "Infirmities in such [accomplice] testimony, such as hopes of leniency or reward, go to the credibility of the witness and his testimony, not to its admissibility. If the jury is satisfied by such testimony that the defendant is guilty beyond a reasonable doubt, then a reviewing court should not disturb the verdict unless it is plainly apparent that such a degree of proof is lacking. (*People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422; *People v. Hansen* (1963), 28 Ill. 2d 322, 192 N.E.2d 359.)"

Although we are mindful that accomplice testimony should be subject to careful scrutiny and acted upon with great caution, we are convinced that the consistent testimony of two accomplices, together with the corroborating testimony of Jeannie Vine, is sufficient to support defendant's conviction for the murder of Johnny Lee Willis.

Based upon the record presented to this court for review, we conclude that the jury's verdict is amply supported by the evidence admitted at the trial of this cause, and find no reason to disturb the jury's verdict.

■ The second argument raised by defendant on appeal is that her sentence is excessive and should be reduced. Specifically, defendant points out her absence of prior criminal activity and her "exemplary life since the crime was committed," and states that "her role in the crime was minor." We disagree with defendant's contention that her sentence was excessive.

Defendant was sentenced to 25 years' imprisonment for her conviction for the first degree murder of Johnny Lee Willis. Pursuant to section 5—8—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)), the range of sentences for first degree murder, absent certain aggravating factors, is 20 to 40 years. We first note that although defendant was not given the minimum sentence she was eligible for, her sentence was near the low end of the range prescribed by statute.

As the court stated in *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 790-91, 483 N.E.2d 944, 955:

> "Sentencing decisions are matters of judicial discretion, and as long as the sentence imposed is within the statutory limits, we may not exercise our power to reduce it absent a finding that the court has abused that discretion since the trial court has a better opportunity to acquire information about the defendant and assess factors in aggravation and mitigation. *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 445 N.E.2d 1213."

Furthermore, it is well settled that an appellate court will not disturb a sentence unless it greatly diverges from the purpose or spirit of the law or is highly disproportionate to the nature of the offense. *People v. Nelson* (1982), 106 Ill. App. 3d 838, 436 N.E.2d 655.

■ We find no abuse of discretion inherent in the sentencing in the instant case. Although defendant had no prior criminal record and had demonstrated considerable academic achievement, including the receipt of a law degree and admittance to the State bar of Texas, she also stood convicted of a brutal, premeditated and senseless murder. Defendant hired two men to kill her ex-boyfriend and drove the victim to the scene of the crime. Under these circumstances we conclude that the trial court properly balanced defendant's lack of a prior criminal record and her academic achievements against her participation in the murder in arriving at a sentence of 25 years' imprisonment, which was much shorter than the maximum term defendant was eligible for. This 25-year sentence for first degree murder certainly was

not highly disproportionate to the nature of the offense and did not diverge from the purpose or spirit of the law, and we find no compelling reason to disturb the sentence imposed by the trial court.

■■ ▌ Defendant's final argument on appeal is that "the facts in this case show that the sentences received by the two codefendants are so unfairly disparate that this judicial abuse of discretion requires a reduction in Ms. Nieto's sentence." Defendant was sentenced to 25 years' imprisonment following a jury trial conviction for murder. Codefendant Lee Vine was sentenced to 24 years' imprisonment on a guilty plea for his role in the same murder.

We agree with the State's argument that the one-year difference in the sentences received by defendant and Lee Vine is not the type of disparity recognized as raising a fundamental fairness problem under Illinois law. As the State points out, the disparity in sentences present in the two cases relied upon by defendant on appeal was much greater than the minor disparity present in the instant case. In *People v. Hall* (1973), 17 Ill. App. 3d 1, 307 N.E.2d 664, one defendant was originally sentenced to 100 to 150 years for murder, whereas a codefendant received a sentence of 20 to 50 years. In *People v. Cook* (1983), 112 Ill. App. 3d 621, 445 N.E.2d 824, the defendant was sentenced to seven years for escape from the county jail, while a codefendant was sentenced to three years for committing the same offense. A review of the reported Illinois cases wherein an appellate court has reduced a sentence based upon disparity of two codefendants' sentences reveals that a gross disparity must be shown in order to invoke the relief now sought by defendant on appeal.

It is well settled that a mere disparity in sentencing between defendants, without more, does not warrant a reduction of the punishment imposed by the trial court. (*People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179; *People v. Thompson* (1967), 36 Ill. 2d 478, 224 N.E.2d 264, *cert. denied* (1967), 389 U.S. 870, 19 L. Ed. 2d 151, 88 S. Ct. 155.) Furthermore, equality in sentencing is not required for all participants in the same crime. (*People v. Patterson* (1981), 100 Ill. App. 3d 207, 426 N.E.2d 978.) In setting defendant's sentence at 25 years' imprisonment, the trial court specifically took into account Lee Vine's 24-year sentence for the same crime. In denying defendant's motion for reduction or modification of sentence, the trial court noted that the jury could have reasonably concluded that the conduct of Vine and Fertner was induced and facilitated by defendant and not the other way around, and that defendant instigated the conduct which led to the death of the victim, that it was planned, and that defendant transported the victim to the prear-

ranged place where the victim was to be killed. Although Vine was the "trigger man," Johnny Lee Willis would not have been murdered if not for defendant's involvement in instigating the crime. Under these circumstances, we conclude that defendant's 25-year sentence was not unduly disparate to the 24-year sentence received by codefendant Lee Vine.

For the reasons stated herein, the judgment and sentence of the circuit court of Champaign County, and the order of the court which denied defendant's motion for reduction or modification of sentence, are hereby affirmed in all respects.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.